*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 07a0386p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

KIMBERLY L. CRUSE,

*Plaintiff-Appellant,*

*v.*

No. 06-5772

COMMISSIONER OF SOCIAL SECURITY,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Western District of Tennessee at Jackson.
No. 04-01341—James D. Todd, Chief District Judge.

Argued: January 22, 2007

Decided and Filed: September 24, 2007

Before: SILER, MOORE, and ROGERS, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Joe H. Byrd, Jr., BYRD & BYRD, Jackson, Tennessee, for Appellant. Janice E. Barnes-Williams, OFFICE OF THE GENERAL COUNSEL, Kansas City, Missouri, for Appellee. **ON BRIEF:** Joe H. Byrd, Jr., BYRD & BYRD, Jackson, Tennessee, for Appellant. Janice E. Barnes-Williams, OFFICE OF THE GENERAL COUNSEL, Kansas City, Missouri, for Appellee.

_____

## OPINION

_____

SILER, Circuit Judge. In this appeal, Plaintiff Kimberly L. Cruse ("Cruse") challenges the district court's decision affirming the determination of the Defendant Commissioner of Social Security ("Commissioner") that Cruse was not disabled and therefore not entitled to disability insurance and supplemental security income ("SSI") benefits under the Social Security Act (the "Act"). Specifically, she advances four contentions on appeal: 1) the Commissioner afforded less than the proper amount of weight to the opinions of her treating physician and nurse practitioner; 2) the Commissioner erred in finding Cruse's testimony about disabling pain, other symptoms, and functional limitations less than credible; 3) the Commissioner's decision finding Cruse not disabled was not supported by substantial evidence; and 4) the Commissioner erred by failing to present vocational expert testimony. Finding no reversible error, we affirm.

1

## I. FACTUAL AND PROCEDURAL BACKGROUND

Cruse was born on May 28, 1981. In 2002, she applied for disability insurance and SSI benefits pursuant to Titles II and XVI of the Act, 42 U.S.C. §§ 401 *et seq.* and §§ 1381 *et seq.*, alleging disability dating from October 15, 2001. Specifically, Cruse alleged that she was unable to engage in any substantial gainful activity due to dizziness, an inability to stand without falling, migraines, and chronic vertigo. Cruse's claim was denied by the Social Security Administration ("Administration") in 2002.

### A. Hearing Before Administrative Law Judge

A hearing was held before an Administrative Law Judge ("ALJ") in 2003. Cruse completed high school and attended one year of college. She had past relevant work experience as a produce clerk, cashier, and greeter. She alleged that on October 15, 2001, she came home from school and passed out. Thereafter, she claimed to have continued suffering from dizziness for which she has regularly received medical attention.

### 1. Relevant Medical History

On October 31, 2001, Cruse was admitted to Jackson-Madison General Hospital due to persistent dizziness. After being released the following day, Dr. Kevin Gray noted that, with medication, Cruse was fairly asymptomatic. On December 11, 2002, Cruse visited Dr. Gale Gardner, complaining of dizziness, imbalance, and falling. Dr. Gardner described Cruse's impairment as total and further noted that she should not return to work pending the outcome of her neurological work-up.[1] Dr. Gardner assessed that Cruse suffered from idiopathic dizziness. On December 26, 2001, Dr. Natasha Mahajan, Cruse's primary care physician, reported that Cruse was not taking any medications, she was in no acute distress, and her neurological examination was negative. Dr. Mahajan also noted that Cruse had been wheelchair-bound for the previous couple of months due to dizziness.

On February 14, 2002, Dr. Anne E. O'Duffy, a neurologist, reported that Cruse's MRI, laboratory studies and strength were "normal," though she did have some "give-way" weakness in her lower extremities. Dr. O'Duffy further remarked that Cruse's gait was markedly abnormal "with swaying and grabbing onto various objects." At one point during the examination, Cruse fell down and reported dizziness after being helped onto a chair, though her blood pressure and pulse remained stable. Noting the lack of neurological explanation for her symptoms, Dr. O'Duffy opined that Cruse had a conversion disorder,[2] and suggested that she undergo a psychiatric evaluation. Dr. O'Duffy also suggested that Cruse's dizziness and vertigo could be migraine-related.

On May 3, 2002, a medical consultant, Dr. Louise G. Patikas, indicated that Cruse's physical impairments, singly or combined, were not severe. On May 21, 2002, Dr. Renga Vasu, a neurologist, observed that Cruse "had difficulty standing and could not balance even with two people holding her even though she could walk with support." Dr. Vasu assessed that Cruse suffered from brainstem migraines and somatization, but ruled out conversion disorder. She suggested that Cruse undergo psychiatric treatment and physical therapy.

Christine Hasselle, a family nurse practitioner, treated Cruse on June 13, 2002, and August 29, 2002. Hasselle reported that Cruse was coherent with a guarded attitude, an appropriate affect,

---

[1] All of Cruse's subsequent neurological work-ups were normal or unremarkable.

[2] Conversion disorder is a psychiatric condition in which emotional distress or unconscious conflict are expressed through physical symptoms.

adequate judgment, intact memory, and no perceptual abnormalities. Hasselle diagnosed Cruse with conversion disorder and anxiety disorder. She assessed Cruse's prognosis as good; however, she indicated that Cruse was unable to work as of the June 13, 2002 evaluation.

On August 20, 2002, Cruse was again seen by Dr. Mahajan, who diagnosed her with the following symptoms: 1) abdominal pain; 2) migraine headaches; 3) dizziness; 4) internal hemorrhoids; and 5) possible conversion reaction.

From August through December 20, 2002, Cruse was examined by Dr. Shankar Natarajan, a pediatric neurologist. Dr. Natarajan indicated that her physical and neurological examinations were unremarkable. During the August 30, 2002 examination, Cruse was diagnosed with vertigo and lower extremity weakness. In an October 14, 2002 letter, Dr. Natarajan advised Cruse not to return to work until her migraines and dizziness were under control. Dr. Natarajan changed his diagnosis to conversion disorder at the following examination, but later ruled it out on December 20, 2002. Dr. Natarajan also indicated that Cruse could move her legs easily when sitting in a wheelchair but "her legs became wobbly" when standing. Cruse refused to be examined during her December 20, 2002 consultation.

On September 5, 2002, Cruse's impairments were again described as non-severe by another medical consultant. Thereafter, Cruse obtained psychiatric treatment from Dr. Martha Gordon from December 26, 2002, through June 3, 2003. On January 11, 2003, Dr. Gordon assessed Cruse's mental capacity for work activity and found that her cognitive work-related limitations were fair to poor in all categories. Dr. Gordon indicated that Cruse was unable to work due to an inability to stand or walk, dizziness, dissociative episodes, depression, anxiety, and panic.

Cruse was hospitalized for two weeks during April 2003 for intensive physical therapy, during which she progressed to walking with the assistance of a rolling walker. Dr. Davidson Curwen, a rehabilitation specialist, stated that Cruse was able to tolerate all scheduled therapies, and that her functional limitations were gradually improving. At her first outpatient visit, on May 15, 2003, Cruse indicated to Dr. Curwen that "overall she [was] doing better," and "[her] strength [had] improved." She further indicated that she was able to get around using a walker, although she did not always need it, and that she was hopeful to be free of the walker within several weeks. Dr. Curwen noted that Cruse was independent in all aspects of self-care and opined that she would be totally independent in six to eight weeks and able to resume all aspects of her life.

Following a psychiatric diagnostic interview on April 10, 2003, Kelly Blair, Psy.D., found that Cruse was alert, cooperative, pleasant, well-oriented, and exhibited appropriate behavior. Despite Cruse's assertion that she could not "retain anything," Dr. Blair believed that she demonstrated adequate recall of both recent and remote events, while displaying a relevant and organized train of thought. Dr. Blair opined that Cruse did not appear to suffer from significant depression or emotional instability. Subsequent progress notes show that Cruse performed adequately on a brief neurocognitive evaluation. She was able to follow three-step verbal and one-step written commands. A personality assessment inventory indicated significant elevation on items measuring concerns about somatic events. Dr. Blair noted that her findings were consistent with conversion disorder.

On June 2, 2003, Dr Mahajan stated that Cruse complained of shortness of breath. Cruse indicated to Dr. Mahajan that she had been through physical therapy and that it had helped her a lot. Dr. Mahajan also noted that Cruse was using a walker and was not in a wheelchair.

Cruse returned to Dr. Mahajan on June 10, 2003, complaining of dizziness and shortness of breath. While at the lab, she passed out and fell. Cruse stated that while her dizziness had

improved, it was returning. During a July 3, 2003 appointment with Dr. Mahajan, Cruse was again using a wheelchair. She was diagnosed with asthma in August 2003.

Dr. Robert Kennon conducted a psychological evaluation of Cruse in September 2003. Cruse related that her daily activities included washing dishes, light cooking and washing clothes, although these tasks were limited by her pain. She also stated that she regularly attended church and shopped for clothes and food using a motorized cart. Dr. Kennon opined that Cruse was capable of managing her own funds. He stated that her stream of thought was logical, clear, and coherent. He found that Cruse had a conversion disorder with a mixed presentation of motor and sensory symptoms or deficits and a personality disorder, non-specific, with predominant masochistic traits. He found that Cruse's psychological difficulties were at the root of her neurological, somatic, and motor deficits. As to the impact on her work-related activities, Dr. Kennon stated Cruse was capable of following simple work rules and using appropriate judgment with the public. However, he indicated that she may have difficulty sustaining employment due to her somatic complaints and unfounded belief that she has an neurological condition.

On September 23, 2003, the intake clinician at Pathways of Tennessee, Inc. ("Pathways") reported that Cruse was neat, casual, coherent, and restless, with fair judgment, poor insight, an appropriate mood and affect, adequate impulse control, poor memory, poor concentration/attention, good eye contact, and a normal, organized, and non-psychotic thought process. The clinician observed that Cruse was adequately able to express her needs, had good verbal skills, and was independent in her activities of daily living. Cruse reported that she was able to read, shop, and spend time with friends without any problems. She was diagnosed with a conversion disorder and dissociative amnesia.

## 2. Testimony at the Hearing

Cruse arrived at the hearing using a walker. She stated that she lived with her parents. She also stated that she was unable to walk at all without the walker.[3] She indicated that her therapy doctor at the time of the hearing advised her to move around as much she could, and that he had not placed any specific restrictions on her.

Cruse indicated that she believed the cause of her symptoms was dissociative disorder. She further indicated that her primary disability is her inability to walk unaided. Cruse testified that on average, she falls two to three times per day after passing out, and gets migraines approximately two to three times per week. Cruse listed a number of undesirable side-effects caused by her migraine prescriptions, but stated that she was getting dizzy before she even went on the medication. Cruse indicated that she did not believe that her symptoms are mental. Cruse also noted that she suffers from asthma. She reported having problems with concentration and that she was incapable of managing her own money. Cruse indicated that at the time of the hearing, she had not suffered a panic attack in over two years.

When asked to describe her typical day, Cruse stated that she is able to get up and bathe herself, but spends most of the remainder of the day resting with her legs elevated. She indicated that she has difficulty reading because of her comprehension level. She stated that she was unable to work because she was seeing so many doctors and had been so ill that she was unable to bathe herself without her mother's assistance. She occasionally went to the mall and had even gone to a national park with her cousins. She also stated that she attends church and sometimes visits her family.

---

[3]The ALJ later questioned Cruse about her statement to Dr. Curwen that she was sometimes able to get around without her walker. Cruse never directly responded, only adding that she "was crawling at one point."

Cruse testified that she had not driven a car since October 15, 2001, though she was never specifically restricted by a doctor from doing so. Cruse further stated that she gets motion sickness from traveling in a car, but it had gotten better. She testified that she could not take public transportation without assistance. Cruse also stated that she would not be able to work at a sit-down job due to her concentration level.

Cruse's mother, Hildreth H. Cruse ("Mrs. Cruse"), also testified at the hearing. She testified about many of the same conditions and limitations already indicated by her daughter, noting that her daughter still falls every day, but passes out less frequently. Mrs. Cruse also stated that her daughter had made progress at the time of the hearing, particularly in the area of personal hygiene, bathing, and dressing herself.

### 3. Decision of the ALJ and Subsequent Procedural History

On December 11, 2003, the ALJ denied Cruse disability insurance and SSI benefits, finding that:

1)      Cruse met the non-disability requirements for a period of disability and disability insurance benefits set forth in Section 216(i) of the Act and was insured for benefits through June 30, 2003, but not thereafter.

2)      Cruse has not engaged in substantial gainful activity since her alleged onset of disability.

3)      Cruse's conversion disorder and asthma are considered "severe" based on the requirements in the Regulations 20 C.F.R. § 404.1520(b) and 416.920(b), but do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4 (Listing of Impairments).

4)      Cruse's allegations regarding her limitations are not supported by the medical evidence and are less than fully credible.

5)      All medical opinions in the record regarding the severity of Cruse's impairments have been judiciously considered per 20 C.F.R. §§ 404.1527 and 416.927.

6)      Cruse retains the physical residual functional capacity to lift and carry up to twenty pounds occasionally, ten pounds frequently, and stand, walk or sit up six hours in an eight-hour day. She should also avoid concentrated exposure to dust, fumes, gases, odors, chemicals, and other pulmonary irritants.

7)      Cruse's mental capacity for work activity is limited only by occasional lapses in concentration.

8)      Cruse's past relevant work does not require the performance of work-related activities precluded by her residual functional capacity.

9)      Cruse's conversion disorder and asthma do not prevent her from performing her past relevant work.

10)     Cruse was not under a "disability" as defined in the Act at any time through the date of this decision, 20 C.F.R. §§ 404.1520(f) and 416.920(f).

Thereafter, on December 4, 2004, the Appeals Council denied review.

Cruse then filed a complaint in federal district court pursuant to 42 U.S.C. § 405(g), challenging the Commissioner's decision.  The district court upheld the Commissioner's decision.

## II.  ANALYSIS

The Act defines "disability" as the inability to engage in "'substantial gainful activity,'" because of a medically determinable physical or mental impairment of at least one year's expected duration. *See Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642 (6th Cir. 2006) (en banc) (quoting 42 U.S.C. § 423(d)(1)(A)).  To identify claimants who qualify as disabled, the Commissioner uses a five-step "'sequential evaluation process.'" *Id.* (quoting 20 C.F.R. § 404.1520(a)(4)).  The five steps are as follows:

1)      A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.

2)      A claimant who does not have a severe impairment will not be found to be disabled.

3)      A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four.

4)      A claimant who can perform work that he has done in the past will not be found to be disabled.

5)      If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

*Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683-84 (6th Cir. 1992) (citing 20 C.F.R. §§ 404.1520(b)-(f), 416.920(b)-(f)); *see also Combs*, 459 F.3d at 642-43 (citing 20 C.F.R. § 404.1520(a)(4)).  The initial burden is on Cruse to demonstrate that she is disabled and cannot engage in her former employment. *See Atterberry v. Sec'y of Health & Human Servs.*, 871 F.2d 567, 569 (6th Cir. 1989) ("The initial burden of proof . . . rests with the claimant to show that he cannot perform his past relevant work.").  With respect to step three, the Commissioner has promulgated an extensive list of impairments. *See Combs*, 459 F.3d at 643 (citing 20 C.F.R. Part 404, Subpart P, Appx. 1 (2005)).  The list, which includes somatoform disorder, provides:

Somatoform Disorders:  Physical symptoms for which there are no demonstrable organic findings or known physiological mechanisms.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied.

A.  Medically documented by evidence of one of the following:

1) A history of multiple physical symptoms of several years duration, beginning before age 30, that have caused the individual to take medicine frequently, see a physician often and alter life patterns significantly; or

2) Persistent nonorganic disturbance of one of the following:

    a. Vision; or

    b. Speech; or

    c. Hearing; or

    d. Use of a limb; or

    e. Movement and its control (e.g., coordination disturbance, psychogenic seizures, akinesia, dyskinesia); or

    f. Sensation (e.g., diminished or heightened).

3) Unrealistic interpretation of physical signs or sensations associated with the preoccupation or belief that one has a serious injury;

AND

B.  Resulting in at least two of the following:

1) Marked restriction of activities of daily living; or

2) Marked difficulties in maintaining social functioning; or

3) Marked difficulties in maintaining concentration, persistence, or pace; or

4) Repeated episodes of decompensation each of extended duration.

20 C.F.R. Part 404, Subpart P, Appx. 1, § 12.07 (2006).

In this case, the ALJ determined that Cruse's residual functional capacity does not preclude her from performing her past relevant work as a cashier and greeter, and that she is not suffering from a severe impairment that meets or equals a listed impairment. Therefore, the burden of proof is on Cruse to show that she is disabled. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003) ("Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work."). We review the Commissioner's application of this framework under a deferential substantial-evidence standard.

**A. ALJ's Treatment of the Medical Opinion Evidence**

Cruse contends that in finding her capable of performing her past relevant work, the ALJ erred "in fail[ing] to give controlling weight to the opinions of [her] treating sources," Dr. Gordon and nurse practitioner Hasselle. First, Cruse points to the ALJ's statement that "the extreme limitations expressed by Dr. Gordon are not supported by the documented available record, and are, therefore, afforded little weight." Cruse insists that the ALJ did not provide any support for this finding.

In general, we have held that the opinions of treating physicians are entitled to controlling weight. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529-30 (6th Cir. 1997) (citing 20 C.F.R. § 404.1527(d)(2) (1997)). "A physician qualifies as a treating source if the claimant sees her 'with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition.'" *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) (alteration in original) (quoting 20 C.F.R. § 404.1502). The record shows that Dr. Gordon performed a "New Patient Evaluation" for Cruse on December 26, 2002, and saw Cruse twice more

thereafter, on January 11 and June 3, 2003. The record also shows that Cruse was treated to a similar extent by other doctors, including Dr. Mahajan, Dr. Natarajan, and Dr. Curwen, and had similar initial assessments performed by other doctors, including Dr. Blair and Dr. Kennon. From this evidence, we cannot say that the ALJ erred by not giving Dr. Gordon's initial assessment, performed on January 11, 2003, controlling weight over the opinions, some more recent than Dr. Gordon's, of the number of other doctors who were as much treating physicians as was Dr. Gordon.

Cruse also suggests that the ALJ improperly discounted the opinion of nurse practitioner Hasselle. Hasselle indicated both in her June 13, 2002 evaluation of Cruse, as well as through a letter dated October 15, 2002, that Cruse was unable to work. While the ALJ summarized Hasselle's findings, he did not give Hasselle's opinion significant weight or explain his reasons for discounting Hasselle's findings. As a nurse practitioner, Hasselle is listed under "other [non-medical] sources." *See* 20 C.F.R. § 404.1513 (1997). We have previously held that an ALJ has discretion to determine the proper weight to accord opinions from "other sources" such as nurse practitioners. *See, e.g., Walters*, 127 F.3d at 530. However, at oral argument, Cruse suggested that a recent Social Security Ruling controls our analysis. SSR 06-03P was issued effective August 9, 2006, and clarifies how the Commissioner is to consider opinions and other evidence from sources who are not "acceptable medical sources." SSR 06-03P, 2006 WL 2329939 (S.S.A.). While the ruling notes that information from "other sources" cannot establish the existence of a medically determinable impairment, the information "may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." *Id.* at *3. The ruling goes on to note that:

> With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners . . . have increasingly assumed a greater percentage of the treatment and evaluation functions handled primarily by physicians and psychologists. Opinions from these medical sources who are not technically deemed "acceptable medical sources," under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other evidence in the file.

*Id.* at *4. Further, the ruling explains that opinions from non-medical sources who have seen the claimant in their professional capacity should be evaluated by using the applicable factors, including how long the source has known the individual, how consistent the opinion is with other evidence, and how well the source explains the opinion. *Martin v. Barnhart*, 470 F. Supp. 2d 1324, 1328-29 (D. Utah 2006) (citing SSR 06-03P, 2006 WL 2329939 at *5-6). Finally, the ruling states that:

> [a]lthough there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions for these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

SSR 06-03P, 2006 WL 2329939 at *7.

In his decision denying Cruse disability insurance and SSI benefits, the ALJ stated the findings of nurse practitioner Hasselle, including her letter advising that "[Cruse] was unable to return to work." The ALJ's only explanation for discounting Hasselle's opinion was that "Hasselle is neither a medical doctor nor a vocational expert, and thus lacks the credentials for making such a determination." As it stands, the ALJ's decision was devoid of any degree of specific consideration of nurse practitioner Hasselle's functional assessments. Following SSR 06-03P, the ALJ should have discussed the factors relating to his treatment of Hasselle's assessment, so as to

have provided some basis for why he was rejecting the opinion. However, SSR 06-03P was not implemented until August 9, 2006, after the Administration had issued its December 4, 2004 final decision through the Appeals Council.

We are not aware of any constitutional or statutory requirement that the Administration apply its policy interpretation rulings to appeals then-pending in the federal courts, absent, of course, ex post facto or due process concerns not present here. Neither in the text of SSR 06-03P nor elsewhere can we identify any intent on the part of the Administration to apply SSR 06-03P to appeals pending in the federal courts as of August 9, 2006, and we therefore decline to require that it be applied in this case.[4] *See Landgraf v. USI Film Products*, 511 U.S. 244, 275 n.29 (1994) ("[T]he mere fact that a new rule is procedural does not mean that it applies to every pending case. A new rule concerning the filing of complaints would not govern an action in which the complaint had already been properly filed under the old regime, and the promulgation of a new rule of evidence would not require an appellate remand for a new trial. Our orders approving amendments to federal procedural rules reflect the commonsense notion that the applicability of such provisions ordinarily depends on the posture of the particular case.").

## B. Substantial Evidence Supports the ALJ's Credibility Assessment of Cruse

Cruse also argues that the ALJ erred in finding that her claimed limitations were not supported by the medical evidence and were less than fully credible. "There is no question that subjective complaints of a claimant can support a claim for disability, if there is also evidence of an underlying medical condition in the record." *Jones*, 336 F.3d at 475 (citing *Young v. Sec'y of Health & Human Servs.*, 925 F.2d 146, 150-51 (6th Cir. 1990)). Here, it is uncontested that doctors diagnosed Cruse with illnesses including conversion disorder and asthma, treated her for those disorders, and have "therefore supplied the requisite objective medical condition to support" Cruse's claim. *Id.* However, "an ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability." *Id.* at 476 (citing *Walters*, 127 F.3d at 531). Notably, an ALJ's credibility determinations about the claimant are to be given great weight, "particularly since the ALJ is charged with observing the claimant's demeanor and credibility." However, they must also be supported by substantial evidence. *Walters*, 127 F.3d at 531 (citations omitted).

Here, the ALJ specifically set forth his reasons for discrediting Cruse's subjective complaints based on the medical evidence and inconsistencies in her testimony. Namely, the ALJ noted that Cruse's testimony regarding her activities was "hardly reflective of any totally disabling disorder." During her September 2003 evaluation by Dr. Kennon, Cruse indicated that her daily activities included washing dishes, light cooking, and doing the laundry. Cruse also reported to the Pathways intake physician that she was able to shop, read, and spend time with friends without any problems. During the hearing, Cruse reported being able to bathe herself, attend church, visit friends, go to the mall, and travel to a national park. *See id.* at 532 ("An ALJ may also consider household and social activities engaged in by the claimant in evaluating the claimant's assertion of pain or ailments.") (citing *Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990)).

Additionally, the record is replete with medical evidence that Cruse's symptoms were not as severe as she suggested. As noted by the ALJ, Cruse claimed that she could not walk without her walker despite the fact that she had told Dr. Curwen that she did not always need the walker and hoped to be free of it within weeks. During Cruse's April 2003 hospitalization for physical therapy, Dr. Curwen noted that she was able to tolerate all scheduled therapies and that her functional limitations were improving. Cruse also indicated that her condition had improved during a May 15,

---

[4]Should Cruse bring another claim before the Administration, the ALJ would be bound by SSR 06-03P.

2003 outpatient visit with Dr. Curwen. Thereafter, Dr. Curwen noted that Cruse was independent in all aspects of self-care and opined that she would be "totally independent" in six to eight weeks. Moreover, at the time of the hearing, Cruse stated that her therapy doctor advised her to move around as much as she could, and that he had not placed her on any specific restrictions.

There are also inconsistencies regarding Cruse's testimony about her concentration. While Cruse stated that she was incapable of managing her own funds, Dr. Kennon opined that she was capable of this function. Despite Cruse's assertion that she was plagued by an inability to concentrate, Dr. Blair found that Cruse demonstrated adequate recall of both recent and remote events, while displaying a relevant and organized train of thought. Moreover, Dr. Kennon indicated that Cruse's stream of thought was logical, clear and coherent. Therefore, substantial evidence supports the ALJ's decision to treat Cruse's testimony as less than credible. *See Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence.") (citing *Bradley v. Sec'y of Health & Human Servs.*, 862 F.2d 1224, 1227 (6th Cir. 1988)).

## C. Substantial Evidence Supports the ALJ's Finding that Cruse's Impairments Do Not Preclude Her from Performing Her Past Relevant Work

Cruse also contends that substantial evidence does not support the ALJ's conclusion that she can return to her past relevant work as a cashier or greeter.[5] The ALJ agreed that Cruse suffered from a conversion disorder and asthma, but determined that the impairments were not severe enough to meet or medically equal the requirements for any listing in Appendix 1 to Subpart P of the Regulations. Specifically, the ALJ found that Cruse suffered from a conversion disorder and, therefore, satisfied Part A of § 12.07. However, the ALJ determined that Cruse had: 1) no difficulty tending to her activities of daily living; 2) no difficulty in maintaining proper social functioning; 3) only moderate difficulties in sustaining concentration, persistence and pace; and 4) no evidence of episodes of decompensation. Therefore, Cruse failed to satisfy Part B of § 12.07. Substantial evidence supports the ALJ's conclusion that Cruse did not have a listed impairment.

Cruse is able to do a variety of daily activities. She takes care of her personal needs and does the dishes and light cooking, talks on the telephone, shops for food and clothes, and occasionally goes to church. While Cruse stated that she is unable to drive or take public transportation, the ALJ is permitted to treat these assertions as less than credible. The ALJ also properly discounted Dr. Gordon's opinion about Cruse's inability to function independently. Therefore, the ALJ's finding that Cruse has no difficulty attending to her activities of daily living is amply supported by the evidence. *See Young*, 925 F.2d at 150 (finding that claimant failed to show marked restriction in activities of daily living where the evidence of record exemplified that claimant was able to perform "a variety of daily activities").

Social functioning refers to an individual's capacity to interact appropriately and communicate effectively with others, including family members, friends, and merchants. 20 C.F.R. Part 404, Subpart P, § 12.00(C)(2). There is no indication that Cruse's social functioning is impaired. She attends church and enjoys visiting with family and friends, occasionally goes to the mall, and has even traveled to a national park with her cousins. Moreover, Dr. Blair found that Cruse was cooperative, pleasant and exhibited appropriate behavior. Furthermore, Dr. Kennon indicated that Cruse was capable of using appropriate judgment with the public. Finally, the ALJ

---

[5]In her brief on appeal, Cruse states as an issue presented that substantial evidence does not support the ALJ's conclusion at step four that she can return to her past relevant work as a cashier or greeter. However, in the argument section of her brief, Cruse contends that substantial evidence does not support the ALJ's conclusion at step three that her condition did not meet or equal a listed impairment in Appendix 1 to Subpart P of the Social Security Regulations. Accordingly, we address here Cruse's argument as she developed it in the argument section of her brief.

properly discounted the opinion of Dr. Gordon regarding Cruse's ability to use judgment with the public. Therefore, substantial evidence supports the ALJ's finding that Cruse did not have marked difficulties in maintaining social functioning.

Concentration, persistence, and pace refers to the "ability to sustain focused attention sufficiently long to permit the timely completion of tasks commonly found in work settings." 20 C.F.R. Part 404, Subpart P, § 12.00(C)(3). While Cruse reported that she did have difficulty with concentration, the ALJ was free to treat her claims as less than credible. Moreover, the ALJ properly discounted the opinion of Dr. Gordon as to Cruse's attention and concentration. Dr. Blair determined that Cruse demonstrated adequate recall of both recent and remote events, while displaying a relevant and organized train of thought. Dr. Kennon stated that Cruse could follow simple work rules. Only the Pathways intake clinician found that Cruse suffered from poor attention. Therefore, substantial evidence supports the ALJ's determination that Cruse suffered only moderate difficulties in maintaining concentration, persistence, or pace.

Arguably, the ALJ failed to identify substantial evidence in the record to show that Cruse did not experience repeated instances of deterioration or decompensation in work-like settings, causing her to withdraw from the situation or to experience exacerbation of signs and symptoms. 20 C.F.R. Part 404, Subpart P, § 12.00(C)(4). Namely, Dr. Kennon stated that Cruse may have difficulty sustaining employment due to her somatic complaints and unfounded belief that she has a neurological disorder. Even so, Cruse has only demonstrated that she suffers from one, not the required two, of the four categories under § 12.07(B). Accordingly, Cruse did not meet the listing requirements of § 12.07 and failed to meet her burden of showing that she is unable to perform her past relevant work as a cashier and greeter. *See Atterberry*, 871 F.2d 569 (noting that burden is on claimant to show she cannot perform past relevant work).

### D. The ALJ Did Not Err by Failing to Obtain the Testimony of a Qualified Vocational Expert

Cruse also suggests that the ALJ committed reversible error by failing to secure the testimony of a vocational expert. This argument lacks merit. As previously discussed, substantial evidence supports the ALJ's conclusion that Cruse's limitations did not render her incapable of performing her past relevant work. Therefore, the burden of proof remained with Cruse. *See Jones*, 336 F.3d at 474 ("Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work, but at step five . . . the burden shifts to the Commissioner to identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity . . . and vocational profile.") (citation omitted).

**AFFIRMED.**