NOT RECOMMENDED FOR PUBLICATION
File Name: 15a0084n.06

No. 14-3417

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Jan 28, 2015
DEBORAH S. HUNT, Clerk

MATTHEW SHILO,                               )
                                             )
        Plaintiff-Appellant,                 )
                                             )
                                             )      ON APPEAL FROM THE UNITED
v.                                           )      STATES DISTRICT COURT FOR THE
                                             )      SOUTHERN DISTRICT OF OHIO
COMMISSIONER OF SOCIAL SECURITY,             )
                                             )             OPINION
        Defendant-Appellee.                  )
                                             )
                                             )


BEFORE:     GIBBONS and STRANCH, Circuit Judges; REEVES, District Judge[*]

JANE B. STRANCH, Circuit Judge.   Claimant Matthew Shilo appeals the Social
Security Commissioner's denial of his application for disability benefits and social security
income. The district court reviewed the Commissioner's decision and affirmed. Shilo alleges
that the Administrative Law Judge (ALJ) erred in rejecting the opinion of Shilo's treating
physician and in failing to consider whether Shilo's obesity limited his ability to work. For the
reasons set forth below, we REMAND the case to the district court, to be REMANDED to the
Social Security Administration for further proceedings.

---

[*]The Honorable Pamela L. Reeves, United States District Judge for the Eastern District of Tennessee, sitting by
designation.

## I.  BACKGROUND

Shilo is now 47 years old, has a G.E.D., and in the past has worked as a truck driver and lawn care worker.  Shilo is morbidly obese: he is 6 feet 3 inches and weighs approximately 430 pounds.  In addition, he has a number of medical conditions, including: back pain due to spinal stenosis; bone spurs, bone and joint degeneration, and swelling in his lower extremities; sleep apnea and shortness of breath; hypertension; and depression.

From December 1993 through May 1999, Shilo received Social Security benefits due to his obesity and back problems.  The benefits ended in July 1999 when he returned to work.  Since just over a year later, Shilo has sought to reclaim those benefits.  He filed an application in October 2000 that was denied in April 2001, filed again in July 2002, and was denied again in April 2004 after an administrative hearing.

This case constitutes Shilo's third attempt.  In December 2007, Shilo again applied for disability insurance benefits under Titles II and XVI of the Social Security Act.  42 U.S.C. §§ 401 *et seq.*, 1381 *et seq*.  He alleges disability since April 8, 2004.  The claim was denied initially and on reconsideration.  Shilo timely appealed and requested a hearing, which was held before an ALJ on January 11, 2011.

The ALJ found that Shilo has several severe impairments: lumbar spine degenerative changes, obesity, right foot arthritic changes, mild degenerative changes in the right knee, obstructive sleep apnea, and dysthymic disorder.  He determined, however, that Shilo was not sufficiently impaired to be eligible for benefits as he had a residual capacity to do light work with restrictions—despite multiple assessments by Dr. Rajendra K. Aggarwal, Shilo's treating family physician, finding that Shilo's impairments rendered him unemployable.  Shilo's request that the decision be reviewed was denied.  Shilo then filed suit in federal district court, the

district court affirmed the ALJ's decision and adopted its findings, and Shilo appealed to this court.

Shilo disputes the ALJ's findings, arguing that the ALJ: (1) improperly applied the treating physician rule and erred in rejecting Dr. Aggarwal's assessments of Shilo's ability to work; and (2) did not adequately consider Shilo's morbid obesity in the context of his analysis.

## II.     ANALYSIS

### A.  Standard of Review

We review de novo a district court's decision concerning Social Security disability benefits. *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 374 (6th Cir. 2013). In such cases, the Commissioner determines whether a claimant is disabled under the Social Security Act and thus entitled to benefits. *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009). Our review is limited to "determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Gayheart*, 710 F.3d at 374 (internal citations and quotation marks omitted). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001), and requires more than a scintilla but less than a preponderance of evidence, *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Therefore, we defer to the ALJ's decision "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Blakley*, 581 F.3d at 406 (internal citations and quotation marks omitted). The ALJ's decision, however, must incorporate the correct legal analysis: "reversal is required" when "the agency fail[s] to follow its own procedural regulation." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). "An ALJ's failure to follow agency rules and regulations 'denotes a lack of substantial evidence,

even where the conclusion of the ALJ may be justified based upon the record.'" *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011) (quoting *Blakley*, 581 F.3d at 407).

To determine if a person is disabled within the meaning of the Social Security Act, the ALJ must adhere to a five-step inquiry. 20 C.F.R. § 404.1520. First, if a claimant is engaged in "substantial gainful activity," he will not be found to be disabled. *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007). Second, a claimant "who does not have a severe impairment will not be found to be disabled." *Id.* Third, an unemployed claimant suffering from a severe impairment "which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations," will be found to be disabled. *Id.* Fourth, if a claimant can perform work done in the past, he will not be found to be disabled. *Id.* Fifth, if a claimant cannot do his former work, the ALJ must determine if the claimant can perform other work, taking into account factors including "age, education, past work experience and residual functional capacity." *Id.* While the claimant bears the burden in steps one through four, the Commissioner bears the burden of identifying "a significant number of jobs in the economy that accommodate the claimant's residual functional capacity . . . and vocational profile." *Coldiron v. Comm'r of Soc. Sec.*, 391 Fed.App'x 435, 438 (6th Cir. 2010) (quoting *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003).

## B. The Treating Physician Rule and Obesity

Shilo argues that, when assessing his residual functional capacity (RFC) for work, the ALJ failed to follow the treating physician rule and improperly rejected Dr. Aggarwal's opinion—based on objective evidence in the record—that Shilo is unable to perform employable services. Shilo also argues that the ALJ failed to conduct a "meaningful analysis" that took his

morbid obesity sufficiently into account at all steps of the disability inquiry. Because the latter

inquiry cannot be extricated from the former, we will consider the two issues in tandem.

According to the treating physician rule, "[a]n ALJ must give the opinion of a treating

[physician] controlling weight if he finds the opinion 'well-supported by medically acceptable

clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial

evidence in [the] case record." *Wilson*, 378 F.3d at 544 (quoting 20 C.F.R. § 404.1527(d)(2)). If

the ALJ decides not to give the treating physician's opinion controlling weight, the ALJ must

still determine how much weight is appropriate by considering factors such as: "the length of the

treatment relationship and the frequency of examination, the nature and extent of the treatment

relationship, supportability of the opinion, consistency of the opinion with the record as a whole,

and any specialization of the treating physician." *Blakley*, 581 F.3d at 406. Furthermore, the

ALJ must "always give good reasons in [the] notice of determination or decision for the weight"

given to the treating physician's opinion. *Id.* Such "good reasons" must be "supported by the

evidence in the case record, and must be sufficiently specific to make clear to any subsequent

reviewers the weight the adjudicator gave to the treating source's medical opinion and the

reasons for that weight." *Id.* at 406-07 (quoting Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5

(1996). This process enables the claimant to understand the reasons underlying the disposition

of his case and permits meaningful appellate review. *Wilson*, 378 F.3d at 544. Agencies are

bound to follow their own regulations, and we will not hesitate to remand a Commissioner's

opinion that fails to articulate "good reasons" for not crediting the opinion of a treating

physician. *Id.* at 545.

We also have recognized that an ALJ must "consider the claimant's obesity, in

combination with other impairments, at all stages of the sequential evaluation." *Nejat v. Comm'r*

*of Soc. Sec.*, 359 F.App'x 574, 577 (6th Cir. 2009). "Obesity is a complex, chronic disease characterized by excessive accumulation of body fat." SSR 02-1P, 2002 WL 34686281, at *2. It must be considered throughout the ALJ's determinations, "including when assessing an individual's residual functional capacity," precisely because "the combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately." SSR 02-1p, 2002 WL 3468281, at *1. The ALJ is not required to use any "particular mode of analysis" in assessing the effect of obesity. *Bledsoe v. Barnhart*, 165 F.App'x 408, 411-12 (6th Cir. 2006).

SSR 02-1P offers detailed guidance on how to assess obesity in conjunction with other impairments. *See Norman v. Astrue*, 694 F.Supp.2d 738, 741-42 (N.D. Ohio 2010) ("this is more than a requirement that the ALJ mention the fact of obesity in passing . . ."). There are three levels of obesity that correlate with BMI levels. The highest level is Level III, which occurs when a claimant's BMI is equal to or greater than 40. It is considered "'extreme' obesity and represent[s] the greatest risk for developing obesity-related impairments." SSR 02-1P, 2002 WL 34686281, at *2. Obesity "commonly leads to, and often complicates, chronic diseases of the cardiovascular, respiratory, and musculoskeletal body systems." *Id.* at *3. For example, "someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from the arthritis alone." *Id.* at *6. The ALJ also must specifically take into account "the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment," and consider how "fatigue may affect the individual's physical and mental ability to sustain work activity"—especially in "cases involving sleep apnea." *Id.* at 6.

6

Between 2005 and 2009, Dr. Aggarwal, Shilo's treating physician, filled out several form assessments of Shilo, many for the Ohio Department of Job and Family Services. All of the assessments described Shilo as unemployable due to slightly varying but generally consistent reasons, including: spinal stenosis, hypertension, and sleep apnea; generally "poor but stable" health; his inability to stand, walk or sit for long periods of time, usually exceeding a half-hour to two hours; limited carrying ability (either five or six to ten pounds); inability to do simple grasping or fine manipulations; and "markedly limited" ability to push, pull, bend or perform repetitive foot movements. R. 8-8, Page ID 560-61; R. 8-8, Page ID 474; R. 8-8, Page ID 475; R. 8-10, Page ID 878; R. 8-12, Page ID 1039-40. Multiple medical records from Dr. Aggarwal and other doctors also indicate linkage between these ailments and Shilo's extreme obesity.

The ALJ explicitly rejected Dr. Aggarwal's assessment that Shilo was unemployable, citing the treating physician rule. The ALJ referred to Dr. Aggarwal's lack of detailed, objective findings in his assessments of Shilo's unemployability and the lack of other objective evidence in the record supporting the conclusion that Shilo could not do even light or sedentary work. The ALJ pointed to several specific factors: the lack of substantial examinations by Dr. Aggarwal in the record; the fact that Dr. Aggarwal is not an orthopedic specialist; the fact that surgery was not indicated for Shilo's back condition; the absence of objective evidence consistent with a serious pain condition; and Shilo's "normal gait" at a consultative exam and lack of a clear medical need for a cane. The ALJ concluded that "due to [a] lack of objective medical findings as to any serious back impairments, no deference is given to Dr. Aggarwal's assessments." R. 8-2, Page ID 52-53. Having rejected Dr. Aggarwal's opinion, the ALJ then adopted the findings of the vocational expert who opined at Shilo's hearing that Shilo could perform light or sedentary work, subject to the following restrictions: the ability to stand or sit as needed and a prohibition

on climbing ropes, ladders or scaffolds, but allowing the occasional climbing of stairs, crawling and kneeling.

Shilo argues that the ALJ lacked "good reasons" for rejecting Dr. Aggarwal's opinion. He points to objective medical evidence provided by Dr. Aggarwal and specialists to whom he referred Shilo, which revealed conditions including: spinal stenosis and degeneration in his lumbar spine; degeneration, spurring and swelling in his legs, knees and feet; sleep apnea, hypertension, and depression. He observes that Dr. Aggarwal has been the claimant's treating physician since at least 2003 and has seen him over fifty times, that his treatment records include records of thorough examinations, and that Dr. Aggarwal is listed as the requesting physician for nearly all of Shilo's medical tests, studies, and medical imaging by other specialists, copies of which are also included in the records. Shilo cites the state examiner's observation that Shilo cannot walk properly in addition to his own testimony at the ALJ hearing that he finds it difficult and painful to walk over a block. Shilo also argues that the lack of a recommendation for back surgery is an improper basis for discrediting Dr. Aggarwal's opinion. All of Shilo's arguments are also necessarily related to his complaint that the ALJ failed to perform a "meaningful analysis" that took his obesity into account.

Review of Dr. Aggarwal's records reveals that Shilo has been treated for multiple ailments related to his obesity for many years. His treatment records for Shilo—which are in the record and largely undated—indicate that Shilo suffered from spinal stenosis, lower back pain, swelling and pain in his feet, gout, hypertension, sleep apnea, "GERD" (gastroesophageal reflux disease") and various respiratory illnesses. Over the years, Dr. Aggarwal has prescribed multiple pain, anti-inflammatory, and blood pressure medications while instructing Shilo to lose weight and adhere to a low calorie diet.

Dr. Aggarwal is not an "orthopedic specialist," but Shilo saw Dr. Thomas Goodall, a neurosurgeon, in 2003. Dr. Goodall examined him thoroughly, had an MRI and lumbar CT scan performed, and diagnosed "multiple levels of degenerative disease" as well as "some degree of foramina stenosis." R. 8-8, Page ID 604. He noted that Shilo "ambulates with the aid of a cane." R. 8-8, Page ID 604. Dr. Goodall discussed various treatment options and, because Shilo was primarily interested in pain control, suggested that he go to a pain center. Shilo then was treated for lower back, left knee, and hip pain by Dr. Townsend Smith at the Miami Valley Hospital Pain Center. Dr. Smith's records indicate that, following an MRI, Shilo was identified as suffering from "multiple levels of degenerative disk disease and facet joint hypertrophy from L3 through S1 with moderate central stenosis at L4-5 and L3-4;" Dr. Smith listed his diagnosis as "lumbar spinal stenosis." R. 8-7, Page ID 400. Shilo indicated that Dr. Goodall had recommended against surgery and that he wished to increase the doses of his pain medications, ranking his pain at a ten out of ten. Dr. Smith instead recommended that Shilo continue his current dosages and lose weight; he was also prescribed anti-inflammatory medications to supplement pain medications already prescribed by Dr. Aggarwal. Dr. Smith eventually also treated Shilo with steroid spinal injections for his pain. When he was treated by Dr. Goodall and Dr. Smith, Shilo weighed 370 pounds. Dr. Smith, too, noted that Shilo used a cane.

Other specialists have treated Shilo for sleep and mental health issues. In 2004, Dr. Rajesh Patel treated Shilo for a sleep disorder. During his consultation with Dr. Patel, Shilo reported frequent daytime drowsiness, instances of falling asleep at traffic lights, and constant fatigue. At the time, Shilo's weight was 444 pounds, with a body mass index of 55.5; a 2005 "impression" of Shilo's medical conditions listed, in the following order: "1. Obesity. 2. Snoring. 3. Sleep-apnea nypopnea syndrome." R. 8-7, Page ID 413, R. 8-8, Page ID 559. Dr.

9

Patel had Shilo undergo a sleep study, diagnosed him with sleep apnea, and prescribed the use of CPAP therapy and recommended an "attempt at weight loss." R. 8-7, Page ID 407-415. Shilo was initially not fully compliant with the use of his CPAP machine, although he testified at the hearing that he uses it regularly. Even so, he characterized himself as often drowsy and stated that he needed to take frequent naps each day to compensate for his poor sleep. As a result of his medical and resulting financial troubles, Shilo also sought treatment for hallucinations and depression from 2003-2005. He saw a therapist and psychiatrist at DayMont West Behavioral Center and was prescribed anti-depressants including Lexapro and Zoloft. During at least one of those visits he appeared to a therapist to be in "obvious physical pain" and walking with an "uneven gait." R. 8-7, Page ID 439.

The medical records reveal that, over the years, Shilo had several diagnostic tests performed. In December 2003, x-rays showed minor spurring and mild arthritic changes in both knees. In August 2004, an x-ray of his left foot showed a small bone spur as well as significant degenerative changes in the surrounding joints. A June 2005 x-ray of his left shoulder revealed minimal degenerative change in the acromioclavicular joint. In December 2005, another x-ray of his right ankle showed mild spurring and mild soft tissue swelling. X-rays of his right foot and knee taken in April 2008 and July 2009, respectively, showed mild to moderate arthritic changes and spurs. A CT scan of Shilo's lumbar spine taken in December 2010 showed multilevel degenerative changes.

More recent hospital records establish that Shilo continued to complain of painful swelling in his feet. He was admitted to the emergency room in October 2007 and diagnosed with plantar fasciitis. In February 2008, Shilo went to the emergency room complaining of pain in his left foot that was exacerbated by walking. He was diagnosed with gouty arthritis. Shilo

10

met with Dr. Jon Ryan in May 2008 to address the foot swelling issues, complaining that he was "unable to ambulate," and was diagnosed with "intermittent polyarticular inflammatory arthritis with hyperuricemia," consistent with gout. R. 8-10, Page Id 837. In 2009, hospital records reveal that Shilo was again admitted to the emergency room on several occasions complaining of pain in his right foot, left toe, right knee, left knee, right toe, left shoulder, as well as chest and abdominal pain.

Shilo saw a physical therapist in September 2009 to address his back and leg pain and improve his walking ability, but cancelled subsequent appointments. He testified that he did complete one round of physical therapy but had to discontinue the next round due to the loss of his health insurance, and that walking caused him too much pain to continue. One examiner who saw Shilo in 2007 at the request of Ohio's Bureau of Disability Determination noted that his "unusual morbid obesity . . . does not allow him to walk around properly." R. 8-9, Page ID 668.

Understood collectively, the medical records confirm the underlying premise of Dr. Aggarwal's assessment: that Shilo suffers from multiple ailments that cause him considerable discomfort, most associated with his extreme obesity. At issue is whether these ailments collectively prevent Shilo from performing any work at all. The record indicates an error in the making of that determination—the ALJ's failure to consider Shilo's extreme obesity and its effects on his multiple ailments in a way that comports with SSR 02-1P's guidance. This failure colors the ALJ's application of the treating physician rule as well as his discussion of Shilo's conditions overall.

The ALJ's comments regarding Shilo's obesity are limited to the following: the observation that Shilo weighed 436 pounds in October 2008; listing "obesity" as the second of Shilo's "severe impairments"; and the bare statement that "[Shilo's] obesity has been considered

11

in combination with the back condition." R. 8-2, Page ID 48. The ALJ's conclusions do not appropriately consider obesity-related evidence in the medical records or Shilo's account of the limiting nature of his extreme obesity as it relates to problems with his legs, feet, and back. For example, the ALJ found no evidence of an "inability to ambulate effectively," R. 8-2, Page ID 50, despite objective medical evidence that Shilo's back, legs and feet are compromised by spinal stenosis, degeneration in the bones and joints, bone spurs, and swelling as documented by an MRI and x-rays and corroborated by frequent and consistent consultations with Dr. Aggarwal, specialists, and staff at hospitals. Dr. Goodall and Dr. Smith noted that Shilo used a cane to walk by 2003, a mental health professional noted his obvious pain while walking dating back to 2005, and a doctor who evaluated Shilo for Ohio's Bureau of Disability Determination in 2007 noted his difficulty walking. Curiously, the ALJ found that Shilo could perform work when he was allowed "the use of a cane to ambulate," even while determining that the cane was "not shown by the record to be medically necessary." R. 8-8, Page ID 51, 53.

Shilo's ability to ambulate also should have been considered in the context of Shilo's body mass index ("BMI")—a disturbing 53.7 where the cut-off for Level III obesity is 40. The examiner for Ohio's Bureau of Disability Determination observed that Shilo's "unusual morbid obesity" "does not allow him to walk around properly." R. 8-9, Page ID 668. Shilo testified that he can only stand for ten minutes, sit for twenty minutes, and lift about twenty pounds; he can only climb steps if using a cane and rail. He stated that he wears knee braces and uses a cane; is often drowsy due to his medications and lack of sleep due to sleep apnea; and suffers from constant and intense pain in his back and legs that obliges him to frequently elevate his legs.

Shilo qualified for social security benefits over twenty years ago due to his obesity and back problems. Though he improved enough to return to work briefly, the ALJ discounted

evidence of further deterioration found in Shilo's medical records, Dr. Aggarwal's assessment, and Shilo's own testimony. Such limitations might well make it difficult for Shilo to engage in "light work," which "requires a good deal of walking or standing," or even sedentary work, which involves "a certain amount of walking and standing," especially for the duration of an entire eight hour work day. 20 C.F.R. § 404.1567.

Such medical record oversights are linked to another underlying problem with the ALJ's analysis: the ALJ improperly concluded that Shilo could and should be penalized for failing to follow his doctor's instructions to lose weight. SSR 02-1p states explicitly that "[t]reatment for obesity is often unsuccessful," and "lost weight is often regained." *Id.* at 2. As a result, the agency "will rarely use 'failure to follow prescribed treatment' for obesity to deny or cease benefits," and "will not find failure to follow prescribed treatment unless there is clear evidence that treatment would be successful." *Id.* at *9. Such success is defined as: "expected to improve [the obesity] to the point at which the individual would not meet our definition of disability, considering not only obesity, but any other impairment." *Id.* at *9. The ruling also contemplates multiple justifications for failing to follow prescribed treatment, including religious objections, an inability to afford prescribed treatment and the lack of free community resources, as well as reluctance to attempt treatments that entail a high degree of risk. *Id.* at *10. "Most insurance plans and Medicare do not defray the expense of treatment for obesity," the ruling notes. *Id.* at *10. SSR 02-1p concludes: "Because of the risks and potential side effects of surgery for obesity, we will not find that an individual has failed to follow prescribed treatment for obesity when the prescribed treatment is surgery." *Id.* at *10.

Yet when the ALJ considered the treatments for Shilo's obesity, he cited "no evidence of any physical therapy, work hardening program, etc., or any weight loss program pursued," as

13

well as claimant's comment that "his family doctor has recommended weight loss and offered a referral to a gastric specialist, but he has not pursued this." R. 8-2, Page ID 53. In light of such evidence, the ALJ determined that "the treatment record simply does not corroborate the severity of claimant's allegations," observing that "there is no evidence that doctors told him to take it easy, sit all day, or not do any significant activities." The Commissioner's brief spells out the implication more fully: "Since Shilo refused to lose weight even though he knew that it was aggravating his condition . . . the ALJ reasonably concluded that his conditions were not as limiting as he alleged." Appellee Br. at 29. But Shilo's inability or alleged lack of effort to lose weight does not reasonably lead to the conclusion that his conditions are not limiting.

Even though his doctors prescribed weight loss, moreover, SSR 02-1p makes it clear that the ALJ cannot penalize Shilo for failing to lose weight. At issue is not Shilo's "refusal" to lose weight but his inability to do so—a symptom itself of obesity. The ALJ should "not find failure to follow prescribed treatment unless there is clear evidence that treatment would be successful"—and no evidence exists in the record that any doctor envisioned that Shilo would successfully lose so much weight. In addition, Shilo offered valid justification for failing to complete physical therapy, citing its high cost and his loss of insurance. His failure to pursue gastric bypass surgery also cannot be used against him, in light of its attendant risks. Given SSR 02-1p's directive, the ALJ erred not only in his analysis of Shilo's failure to lose weight, but also in using such evidence to discredit Shilo's credibility more generally—especially his reports of pain associated with walking and standing—and by implication, Dr. Aggarwal's assessment of Shilo's physical capacity for work as well as copious medical records indicating that Shilo has difficulty walking, standing and sitting without pain.

In sum, the ALJ's analysis uses Shilo's inability to lose weight against him, denying him benefits because he suffers from obesity—even though morbid obesity is one ground of his disability claim. The Social Security's own rulings, however, explicitly forbid this kind of reasoning. Rather, the ALJ must "follow agency rules and regulations," especially where a failure to do so leads to an improper discounting of objective medical evidence as well as claimant testimony. *Cole*, 661 F.3d at 937. Especially in close cases such as this one, it is critical that all the medical evidence be assessed and that such assessment take into account the Social Security Administration's published guidance. The case will be remanded to do so.

## III.    CONCLUSION

For the foregoing reasons, we REMAND this case the district court, with instructions that the court in turn REMAND claimant's case to the Commissioner for further proceedings consistent with this opinion.