NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0146n.06

No. 09-6437

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

**Mar 15, 2011**

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| JOHNNY S. PARKS, | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF KENTUCKY |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SOCIAL SECURITY ADMINISTRATION, | ) | |
| | ) | **OPINION** |
| Defendant-Appellee. | ) | |
| | ) | |

BEFORE:  COLE and WHITE, Circuit Judges, and O'MEARA,[*] Senior District Judge

**HELENE N. WHITE, Circuit Judge.**  Johnny S. Parks appeals the denial of his application

for disability insurance and supplemental security income benefits.  After suffering a heart attack and

undergoing coronary bypass surgery in early June 2005, when he was 53 years old, Parks was unable

to continue working as a truck driver and heavy equipment operator and sought benefits.  Parks's

claim was heard by an administrative law judge, who concluded that Parks became disabled when

he turned 55 years old in February 2007, but that he was not disabled prior to this time.  The district

court upheld this decision.  We **AFFIRM.**

---

[*]The Honorable John Corbett O'Meara, United States District Court for the Eastern District
of Michigan, sitting by designation.

**I.**

**A.**

Plaintiff Johnny S. Parks has spent most of his career working as a coal-truck driver and heavy equipment operator in the coal-mining industry. He was first examined by a physician for heart-related medical problems on August 19, 2003. On this occasion, he was treated by Dr. Stuart J. Bresee at the University of Tennessee Memorial Hospital. Parks underwent heart catheterization, coronary angiography, and left ventriculography. He was diagnosed with mild coronary-artery disease, but no limitations were placed on his level of physical exertion and he continued to work after undergoing this examination.

Parks claims that he became disabled as of March 31, 2005. On this date, Parks experienced chest pain, shortness of breath, and weakness while at work. He was evaluated by Dr. Bruce Woodall and stayed overnight at Jellico Community Hospital. Parks was discharged with the following diagnosis: "(1) chest pain, myocardial infarction excluded, suspicious for angina; (2) mild coronary artery disease; (3) gastroesophogeal reflux disease; (4) hyperlipidemia; and (5) mild obesity." The discharge report stated that Parks's prognosis was good and did not suggest that he would be limited with respect to his work abilities. Parks returned to work following his brief hospital stay.

On June 3, 2005, Parks was admitted to Jellico Memorial Hospital complaining of chest pain and discomfort that arose while he was resting. Dr. Clint Doiron performed a cardiac catheterization and recommended that Parks undergo coronary-artery bypass surgery. Parks was then transferred to the Baptist Hospital of East Tennessee where he was seen by Dr. Lacy Harville. Dr. Harville

performed coronary bypass surgery on June 7, 2005. On June 11, 2005, Parks was discharged from the hospital with the following instructions: "no smoking and avoid second-hand smoke. No heavy lifting over 10 pounds or driving at this time. Call the office for temperatures greater than 101." Ten days after being discharged, Parks first applied for disability status with the Department of Disability Determination in Frankfort, Kentucky.

On June 27, 2005, Dr. Harville sent a letter to Dr. Doiron with an update on Parks's status. Dr. Harville stated that Parks was "doing remarkably well" and that, as of the date of the communication, he was permitted to resume driving, but was "cautioned . . . to avoid lifting anything heavier than 15 pounds for the first three months after his surgery."

Approximately two months later, on August 26, 2005, Dr. John N. Boll, Parks's primary-care physician, conducted a follow-up examination and observed that Parks's

> cardiologist has noted that he does not want [Parks] to return to his job at the present time; he works as a heavy machine operator. There is really no light duty at his occupation. The possibility of returning there in the future may be, however he'll most likely be off several months, at least until he sees the cardiologist.

Following an October 18, 2005 examination, Dr. Boll noted that Parks's chest pain was almost gone, that he was feeling well, and that he "was wondering about going back to work." Dr. Boll further stated that he encouraged Parks to call him "if he were to find a job that he would be able to perform. At which point we could discuss with cardiology about releasing him to go back."

Parks attempted to return to his job as a heavy equipment operator at some point between October and November 2005. In a letter dated November 2, 2005 from Dr. Doiron to Parks, Dr. Doiron reported that Parks had "attempted to go back to work and found that [he] was unable to do

this." Dr. Doiron also opined that Parks had "not really recovered yet from the surgery" and that he exhibited chest pains and pain in the muscles and joints. Dr. Doiron ultimately recommended that Parks continue his cardiac rehabilitation, stating:

> You have attempted to go back to work and found that you are unable to do this. This has been documented. I would say that we do not have all of the answers yet. We just need to back off on your Crestor which could be causing some of these symptoms . . . . *Obviously you will not be able to work for an indeterminate amount of time until we ascertain the exact etiology of your problems.*

On December 16, 2005, Dr. Boll conducted a follow-up examination and reported that Parks returned to work "for a day and a half but ended up having significant [chest pain], got hospitalized and ended up being put off work until February by his cardiologist. He has been frustrated by this."

A myocardial perfusion scan done on February 9, 2006 was abnormal, revealing anterior wall ischemia and an ejection fraction of 55%. Based on an examination conducted the same day, Dr. Doiron observed that Parks had "chest discomfort and shortness of breath when he trie[d] to exert himself." As a result, on March 16, 2006, Dr. Doiron performed a percutaneous transluminal coronary-angioplasty with stenting of the left main coronary artery. Dr. Doiron reported that Parks "had an excellent result" from the stenting. On May 4, 2006, Parks returned to Dr. Doiron's office for a follow-up examination and saw Physician's Assistant Eric Dickenson. Parks reported that in general he was feeling fairly well despite the fact that he still had some chest wall soreness and musculoskeletal-type discomfort. Erickson saw no changes from Parks's July 2005 electrocardiogram. He noted that Parks was walking thirty-five minutes a day.

On October 24, 2006, Parks saw Dr. Boll and complained of mild shortness of breath during exercise. Dr. Boll said that this could be bronchospasm and recommended some medication. He

asked that Parks come in for a follow-up visit in three months. Parks also told Dr. Boll that he had difficulty with his hands and neck. Dr. Boll recommended pain medication and noted that Parks would wait to decide whether he wanted to be referred to a specialist to address this issue.

On June 6, 2007, Dr. Boll wrote in a letter that Parks had "ongoing issues in relationship to his coronary artery disease," which had "made it very difficult [for Parks] to perform tasks around his house . . . [and] in a work environment." Although he stated that he did not conduct disability exams in the office, Dr. Boll recommended that Parks be restricted to walking for only one hour, standing for fifteen to twenty minutes, and sitting for thirty minutes at a time.

Several doctors evaluated Parks in connection with his request for disability benefits. On October 4, 2005, Dr. Jorge Baez-Garcia reviewed Parks's earlier treatment records on behalf of the Social Security Administration (SSA) and found Parks's allegation of a heart attack to be credible. Dr. Baez-Garcia determined, based on the fact that Parks was doing very well after his surgery, that Parks could occasionally lift and/or carry fifty pounds, frequently lift and/or carry twenty-five pounds, stand and/or walk for about six hours in an eight-hour workday with normal breaks, sit for about six hours in an eight-hour workday with normal breaks, and push and/or pull without any restrictions. These determinations were consistent with an ability to perform medium work. *See* 20 C.F.R. § 404.1567(c).

On July 13, 2006, Dr. Timothy Gregg assessed Parks's physical residual functional capacity for the SSA. Dr. Gregg solely reviewed Dr. Baez-Garcia's opinions and affirmed the results of the evaluation conducted on October 4, 2005 by Dr. Baez-Garcia. Dr. Gregg's single independent finding was that Parks should avoid concentrated exposure to extreme heat and cold.

On July 27, 2006, Dr. Gary Wortz conducted a consultative examination of Parks on behalf of the SSA. At the in-person exam, Parks stated that "his chest pain [was] getting more frequent and more severe and being brought on with less exertion . . . [and] . . . that his chest pain limit[ed] his activities that require endurance." He also reported that he could walk for one block, stand for one half-hour, sit for one hour, lift one gallon of milk, and do most of his activities of daily living. Dr. Wortz concluded that there existed "[n]o physical evidence for significant restriction in the patient's tolerance for stooping, bending, sitting, standing, moving about, or ability to travel [although there was] . . . .some evidence for restriction of the patient's tolerance for reaching, lifting, carrying and handling objects." He found "mild-to-moderate impairment secondary to [Parks's] angina." Dr. Wortz also noted that Parks had carpal tunnel syndrome and therefore he would be "limited in his activities requiring repetitive motion of the bilateral hands and would have a mild impairment secondary to his condition." Dr. Wortz found that Parks's "gross manipulation [was] within normal limits." He also stated that Parks did not "have any restriction in his daily activities, interest, ability to relate[,] memory and concentration."

In addition to undergoing physical examinations, Parks was also evaluated for possible mental impairments. On November 5, 2005, Parks met with Dr. Robert Spangler, a licensed psychologist who was assigned by the SSA to conduct the initial in-person consultative examination in connection with Parks's application for disability status. Dr. Spangler assessed Parks's mental functioning and medical history and noted that Parks was alert, was "oriented by four," had "adequate recall of remote events, but inadequate recall of recent events," was "pleasant and forthcoming," and was "mildly anxious." Dr. Spangler diagnosed Parks with "[a]djustment disorder

with anxious mood, mild secondary to medical condition." He further noted that Parks had "[l]ow average intelligence" and "[l]imited education." Finally, Dr. Spangler opined that Parks's

> ability to understand and remember is limited due to long-term memory and impairment recent events, moderate, and limited education academic skills. His ability to sustain concentration and persistence is not significantly limited. His social interaction is limited due to an adjustment disorder with anxious mood, mild. His ability to adapt is not significantly limited.

On November, 18, 2005, Dr. Edward Stodola reviewed the medical evaluations submitted in connection with Parks' application for disability status, specifically Dr. Spangler's evaluation, and determined that Parks suffered from an anxiety-related disorder[1] and medical impairments, not severe.[2] Dr. Stodola concluded that Parks had mild limitations on his daily living, social functioning, concentration, persistence and pace, and suffered no limitations from decompensation. On July 31, 2006, Dr. Lea Perritt examined Parks's records and agreed with Dr. Stodola's determinations.

**B.**

Parks first applied for disability status on June 21, 2005. His application was denied initially on December 5, 2005 and upon reconsideration on August 9, 2006. In the reconsideration notice, the Regional Commissioner of the SSA stated that "due to your overall condition, you would have some work-related limitations. However these limitations would not prevent you from performing all types of jobs. Based on your description of your past work as a highlift operator, we have concluded that you have the ability to perform this job."

---

[1]Dr. Stodola determined that Parks suffered from "adjustment disorder with anxiety, mild."

[2] In the context of disability under the Social Security Act, the term "severe" indicates an impairment that "significantly limit[s] [one's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1521(a), 416.921(a).

On September 5, 2006, Parks timely requested a hearing before an administrative law judge (ALJ). The hearing took place on April 16, 2007. Parks, who was represented by an attorney, testified at the hearing. Vocational expert Anne Thomas also testified at the hearing.

Thomas first stated that Parks's work as a truck driver was considered medium, semi-skilled work and his work as a coal miner was very heavy, skilled work. She testified that Parks did not acquire any skills from his previous jobs that could be transferred to other light or sedentary work. The ALJ then asked Thomas the following hypothetical question,

> assume the claimant is capable of performing a range of light exertion. Assume he could be capable of sitting or standing, each 30 minutes at a time uninterrupted before having to change positions. No climbing of ladders, ropes, or scaffolds. No crawling. No more than occasional use of climbing of ramps or stairs. No more than occasional bending or stooping or crouching or balancing. No work at unprotected heights, around hazardous machinery, in temperature extremes and the claimant referred to 40 to 80 degree Fahrenheit temperatures. . . . No excessive levels of humidity. No more than frequent reaching, handling, or fine manipulation with the upper extremities. No more than simple instructions.

Taking into account Parks's age, limited education, and work experience, Thomas testified that Parks could hold the following light and unskilled jobs: production laborer, hand packer, and production inspector. Parks's attorney asked Thomas whether Parks would have to work at a fast pace at any of these positions. Thomas answered that production inspectors work on a line and must meet quotas, while hand packers and production laborers do not do production rate or quota work. Parks's attorney also asked whether Parks would be permitted to take more than three breaks per day (two breaks and a lunch period) because he had difficulty walking for more than five or six minutes

at a time. Thomas said that taking more than the allotted amount of breaks would eliminate all potential jobs.

On July 25, 2007, the ALJ issued a partially-favorable decision, finding that Parks was disabled as of February 13, 2007, the date he turned 55 years old, but that he was not disabled prior to this time. After reviewing the entire record, the ALJ went through the first three steps of the evaluation process designed to determine whether Parks was disabled. At step three, the ALJ determined that Parks did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1 (20 C.F.R. §§ 404.1520(d) and 416.920(d)). He rated Parks's "limitations with regard to restriction of activities of daily living as mild; difficulties in maintaining social functioning as mild to moderate; difficulties in maintaining concentration, persistence, or pace as mild to moderate; and repeated episodes of decompensation, each of extended duration as none."

Prior to considering step four, the ALJ determined that Parks had

the residual functional capacity to perform a range of light exertion that allows a sit/stand option every 30 minutes. [Parks] cannot climb ladders, ropes, or scaffolds and cannot crawl. He can climb ramps and stairs on an occasional basis. He should avoid balancing, crouching, temperature and humidity extremes and hazardous machinery. [Parks] can perform no more than frequent reaching, handling, or fine manipulation with the upper extremities. [Parks] is limited to work that involves no more than simple instructions.

At step four, the ALJ determined that Parks was unable to perform any past relevant work. Finally, at step five, the ALJ determined that considering Parks's age, education, work experience,

and residual functional capacity, there were a significant number of jobs in the national economy that he could have performed prior to February 13, 2007.[3]

Parks requested a review of the ALJ's partially-favorable decision, which was denied by the Appeals Council. Parks then filed an action in the United States District Court for the Eastern District of Kentucky, arguing that the SSA's decision was not supported by sufficient evidence, was contrary to the applicable law, and evidenced the incorrect application of certain standards. The district court affirmed the denial of benefits, finding that the ALJ's determination was supported by substantial evidence. Parks timely appealed.

## II.

Parks raises three issues on appeal. He argues that the ALJ's decision was not supported by sufficient evidence because the ALJ (1) rejected the opinions of two treating sources without providing good reasons for doing so; (2) made no reference to 20 C.F.R. § 404.1562, which directs a finding of disability if a claimant has a marginal educational level, has done arduous unskilled physical labor for 35 years or more, and is no longer able to do this kind of work because of a severe impairment; and (3) asked the vocational expert a hypothetical question that did not accurately portray Parks's physical and mental impairments.

The Social Security Act (the Act) defines disability as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a

---

[3]Once Parks turned 55 years old on February 13, 2007, however, Medical-Vocational Rule 202.06 directed a finding of "disabled" based on his education level, lack of transferable skills, and limitation to light work.

continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual is disabled under the Act "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id*. § 423(d)(2)(A).

To determine if a claimant is disabled within the meaning of the Act, the ALJ must follow a five-step analysis, as set forth in 20 C.F.R. § 404.1520. Pursuant to this five-step inquiry: (1) a claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings; (2) a claimant who does not have a severe impairment will not be found to be disabled; (3) a finding of disability will be made without consideration of vocational factors if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four; (4) a claimant who can perform work that he has done in the past will not be found to be disabled; and (5) if a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed. *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007) (citing *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683-84 (6th Cir. 1992)).

The claimant bears the burden of proof at steps one through four. *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004). At step five, however, the burden shifts to the Commissioner to identify "a significant number of jobs in the economy that accommodate the

claimant's residual functional capacity (determined at step four) and vocational profile." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). In this case, it is undisputed that Parks can no longer perform his past work. Thus, we must determine whether substantial evidence supports the ALJ's determination that, based on Parks's residual functional capacity, age, education, and work experience, he was, prior to February 13, 2007, able to make an adjustment to other work available in the national economy. *See* 20 C.F.R. § 404.1520(a)(4)(v); *see also* 20 C.F.R. § 416.920(a)(4)(v).

The Commissioner's conclusion will be affirmed absent a determination that the ALJ failed to apply the correct legal standard or made fact findings unsupported by substantial evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009) (citing 42 U.S.C. § 405(g)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 604 (6th Cir. 2009) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). In order to affirm the Commissioner's decision, we need not "agree with the Commissioner's finding, as long as it is substantially supported in the record." *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010) (citations omitted).

**A.**

Parks first challenges the ALJ's decision by arguing that the ALJ improperly rejected the opinion of Parks's treating physicians. In assessing the medical evidence supporting a claim for disability benefits, the ALJ must adhere to certain standards such as the "treating physician rule." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009). This rule "requires the ALJ to

generally give greater deference to the opinions of treating physicians than to the opinions of non-treating physicians," *id.*, because "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)).

The ALJ must afford a treating source opinion controlling weight if the treating source opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in [the] case record." *Id.* (quoting 20 C.F.R. § 404.1527(d)(2)). If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, any specialization of the treating physician, and whether the treating source opinion is supported by the record and is consistent with the record as a whole. *See Blakley*, 581 F.3d at 406; *Wilson*, 378 F.3d at 544; *see also* 20 C.F.R. § 404.1527(d)(2).

Further, the regulations require the ALJ to "always give good reasons in [the] notice of determination or decision for the weight" given to the claimant's treating source's opinion. 20 C.F.R. § 404.1527(d)(2). These good reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Blakley*, 581 F.3d at 407 (citations omitted). We have held that an ALJ's "failure to follow the procedural

requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight" given "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir. 2007).

Parks's three treating physicians were Dr. Harville, Dr. Doiron, and Dr. Boll. Parks specifically argues that the ALJ improperly rejected the opinions of Dr. Harville and Dr. Doiron. We disagree. The ALJ referred to Dr. Harville's recommendation that Parks should lift no more than fifteen pounds for three months after his surgery.[4] Additionally, the ALJ correctly observed that "no treating source has described the claimant as unable to perform even light exertion for at least twelve months prior to his 55th birthday."

Dr. Doiron did tell Parks in November 2005 that he would "not be able to work for an indeterminate amount of time until we ascertain the exact etiology of your problems." This statement, however, does not suggest that Dr. Doiron adjudged Parks to be disabled. Although Dr. Doiron may have been suggesting that Parks could not return to his previous job, for Parks to be

---

[4]Contrary to Parks's contention, this does not constitute a limitation to sedentary work. Instead, it falls between the sedentary and light work categories and is limited in duration to three months in light of the recency of Parks's surgery. "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying [small] articles . . . and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties." 20 C.F.R. § 404.1567. On the other hand, light work "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567. A job in this category could involve "a good deal of walking or standing" or "sitting most of the time with some pushing and pulling of arm or leg controls." *Id.*

considered disabled he would have to have been unable to perform not just his past work, but also any other substantial gainful work that exists in the national economy. 20 C.F.R. § 404.1505; *see also* 20 C.F.R. § 416.909. Further, Dr. Boll noted in December 2005 that after his unsuccessful return to work, Parks's cardiologist (presumably Dr. Doiron) "put off work until February [2006.]" This comment does not suggest that Dr. Doiron determined that Parks was disabled. Instead, it suggests that Dr. Doiron was considering permitting Parks to return to work at some point following Parks's unsuccessful attempt to resume his previous job.

The ALJ also ruled in Parks's favor with respect to the reports of the non-treating, reviewing physicians. Dr. Wortz found that Parks had mild to moderate impairment in activities requiring endurance while Dr. Gregg opined that Parks could perform work requiring medium exertion. The ALJ, however, gave Parks's "testimony partial credibility and [found] that he [was] limited to light exertion, based on his testimony and the prior opinions of treating physicians." None of the treating physicians' opinions are inconsistent with this finding. Because the ALJ did not reject the opinions of Parks's treating physicians, the ALJ's decision is supported by substantial evidence.

**B.**

Next, Park argues that the ALJ erred by failing to apply 20 C.F.R. § 404.1562 to resolve Parks's claim. Pursuant to this provision, a claimant is considered disabled if he (1) has done only arduous unskilled physical labor; (2) has no more than a marginal education; (3) has work experience of thirty-five years or more; and (4) is not working and is no longer able to do this kind of work because of severe impairment(s).

Parks has previously performed skilled and semi-skilled work and therefore he cannot satisfy the first requirement of 20 C.F.R. § 404.1562. Additionally, to fulfill the requirement of having no more than a marginal education, Parks would have had to attend school for six grades or less. 20 C.F.R. § 404.1564(b)(2). Because he attended school for ten grades, Parks is considered to have a limited education. *Id.* § 404.1564(b)(3). Evidence outside the numerical grade level that the claimant completed in school may be used to determine the claimant's educational abilities. However, "if there is no other evidence to contradict it, [the SSA] will use [the claimant's] numerical grade level to determine [the claimant's] educational abilities." *Id.* § 404.1564(b). Parks's argument that he was unable to perform "serial 7s or serial 3s" when asked to do so by Dr. Spangler does not contradict that he has a limited (and not a marginal) education. Despite Parks's failure to complete some tests, Dr. Spangler ultimately opined that Parks had a limited education.

Moreover, it is unclear whether Parks has thirty-five years of work experience (not to mention arduous, unskilled work experience), as required by the statute, because his listed work experience begins in 1984, or twenty-six years ago, and the work record appended to his disability application dates back to 1980. Thus, the ALJ did not err by declining to apply 20 C.F.R. § 404.1562.

## C.

Finally, Parks argues that the ALJ's hypothetical question did not accurately portray Parks's mental and physical impairments. "In order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray a claimant's physical and mental

impairments." *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010). Hypothetical questions, however, need only incorporate those limitations which the ALJ has accepted as credible. *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993).

Parks argues that the ALJ failed to incorporate Dr. Wortz's finding of limited endurance and restrictions in reaching and handling and Dr. Spangler's findings of long-term memory deficits and difficulty with social interaction into the hypothetical question posed to the vocational expert. Although the ALJ did not describe Parks's limitations using the exact language used by the treating and examining physicians, he incorporated all of Parks's credible mental and physical impairments.

First, the ALJ's statement that Parks could perform a range of light exertion—meaning lifting no more than twenty pounds at a time and frequent lifting or carrying of objects weighing up to ten pounds—benefitted Parks, as Dr. Baez-Garcia and Dr. Gregg said that Parks could occasionally lift and/or carry fifty pounds and frequently lift and/or carry twenty-five pounds. Second, the ALJ's statement that Parks was "capable of sitting or standing, each 30 minutes at a time uninterrupted before having to change positions," partially reflects Dr. Boll's recommendation that Parks be restricted to walking for only one hour, standing for fifteen to twenty minutes, and sitting for thirty minutes at a time, and reflects Dr. Wortz's finding, based on his conversation with Parks, that Parks could walk for one block, stand for one half-hour, and sit for one half-hour.

Third, the ALJ's statement that Parks could not climb ladders, ropes, or scaffolds, crawl, and only bend, stoop, crouch, or balance on occasion benefits Park, as Dr. Wortz determined that there existed "[n]o physical evidence for significant restriction in the patient's tolerance for stooping, bending, sitting, standing, moving about, or ability to travel." Fourth, the ALJ's statement that Parks

could not do "more than frequent reaching, handling, or fine manipulation with the upper extremities" reflects Dr. Wortz's opinion that there was "some evidence for restriction of the patient's tolerance for reaching, lifting, carrying and handling objects," and that Parks's carpal tunnel syndrome would limit "his activities requiring repetitive motion of the bilateral hands," while crediting Dr. Wortz's determination that Parks's "gross manipulation [was] within normal limits."

Fifth, the ALJ's directive that Parks could not work in temperature extremes or where excessive humidity was present reflected Dr. Gregg's assessment that Parks should avoid concentrated exposure to extreme heat and cold. Sixth, and finally, the ALJ's statement that Parks could receive no "more than simple instruction," reflects Dr. Spangler's determination that Parks's ability to understand and remember was limited due to long-term memory impairment. This statement also reflects Parks's prior skilled and semi-skilled work experience, as he necessarily received at least simple instruction at his previous jobs.

Parks correctly points out that the ALJ did not mention that Dr. Spangler diagnosed Park with an "adjustment disorder" and opined that his social interaction was limited. Dr. Stodola and Dr. Perritt rejected Dr. Spangler's determination on this point, however, and even Dr. Spangler noted that Parks was "pleasant and forthcoming" during their meeting. Because the ALJ only needed to include in the hypothetical limitations he found credible and that were supported by the evidence, he need not have included a disputed limitation that was also negated by Parks's manner during his in-person testimony. As a result, the ALJ's hypothetical question accurately portrayed Parks's impairments.

**III.**

Based on the foregoing, we **AFFIRM** the district court's decision, which upheld the ALJ's

determination in this case.