**NOT RECOMMENDED FOR FULL-TEXT PUBLICATON**
File Name: 14a0703n.06

No. 13-1696

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Sep 08, 2014
DEBORAH S. HUNT, Clerk

KIMBERLY SMITH-JOHNSON,

    Plaintiff-Appellant,

v.

COMMISSIONER OF SOCIAL SECURITY,

    Defendant-Appellee.

)
)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

**OPINION**

Before: BOGGS and MOORE, Circuit Judges; BARRETT, District Judge.[*]

BARRETT, District Judge.  Plaintiff-Appellant Kimberly Smith-Johnson appeals the district court's summary judgment decision upholding the Defendant-Appellee Commissioner of Social Security's denial of Smith-Johnson's petition for Disability Insurance Benefits and Supplemental Security Income under the Social Security Act.  Because the district court correctly determined that the Administrative Law Judge was not required to assess Smith-Johnson's cognitive abilities under Listing 12.05(C) and that the Administrative Law Judge properly accounted for Smith-Johnson's specific limitations in the Residual Functional Capacity assessment and the hypothetical question presented to the Vocational Expert, we AFFIRM.

---

[*]The Honorable Michael R. Barrett, United States District Judge for the Southern District of Ohio, sitting by designation.

## I. BACKGROUND

### A. Factual Summary

Smith-Johnson, born September 26, 1962, is a high school graduate. She has had many difficulties with interpersonal relationships, which are evidenced in part by her taking night school to avoid peers, getting kicked out of the military for difficulty with authority, and being denied a job due to inappropriate behavior towards her co-workers. Nevertheless, she has held multiple jobs, including jobs as a disability trainer, a home health aide, and a packager. Her last job was as a seasonal packager between May 2008 and September 2008, after her alleged disability onset date. Generally, Smith-Johnson spends her days doing chores such as laundry and washing dishes. She also cares for her grandson and reads "a lot."

Smith-Johnson's psychological treatment records begin around January 2008. Around that time, therapist Laverne McGowan indicated Smith-Johnson exhibited signs of bipolar disorder. Included among Smith-Johnson's treatment records are notes that Smith-Johnson displayed average intelligence, as well as normal judgment and memory. As to Smith-Johnson's behavior, McGowan indicated Smith-Johnson poorly adapts to change, avoids conflicts or deals inappropriately with conflict, exhibits low tolerance for rejection during job seeking, will lack initiative and energy to look for work independently, will have difficulty functioning in a competitive work environment, and will have difficulty maintaining punctuality and attendance.[1]

On April 29, 2008, Smith-Johnson submitted to a psychological evaluation by Mary P. Koopman, a licensed professional counselor and limited licensed psychologist, which was co-signed by P. Douglas Callan, Ph.D., a licensed psychologist. Part of the evaluation consisted of

---

[1] These findings were not given controlling weight by the State Agency consultant, Rom Kriauciunas, Ph.D., because they were not co-signed by a psychologist or psychiatrist.

testing on the Weschler Adult Intelligence Scale, III ("WAIS-III"). On the WAIS-III test, Smith-Johnson obtained a Full Scale IQ score of 76 (borderline), a Verbal IQ score of 69 (extremely low), and a Performance IQ score of 89 (low average). Koopman found Smith-Johnson's overall intellectual functioning difficult to summarize by the Full Scale IQ score "because there are large discrepancies between the scores that compose the Verbal and the Performance scales." R. 9-8, at 224. Koopman concluded that Smith-Johnson's Performance IQ score is the "better measure of her innate ability." R. 9-7, at 229. Smith-Johnson also was evaluated on the Weschler Individual Assessment Test ("WIAT-II"). On the WIAT-II, Smith-Johnson received a "borderline" score for reading comprehension, which Koopman identified as a "specific area of difficulty for [Smith-Johnson] relative to her overall ability." R. 9-7, at 226. Koopman assessed Smith-Johnson as having a reading disorder and "Deferred" (meaning she had insufficient information for) a determination on Axis II (Personality Disorders). Koopman advised against Smith-Johnson seeking work that involved "children, elderly or the ill" due to her past mental-health symptoms and potential to act out, but she indicated that Smith-Johnson could work as a receptionist, secretary, legal assistant (with some challenges due to weak reading and math abilities), or medical biller, provided her psychological symptoms were stabilized. At the time of the evaluation, Smith-Johnson had reported she was not receiving treatment for her symptoms.

In April 2009, Rom Kriauciunas, Ph.D., a state agency consultant, performed a non-examining Psychiatric Review Technique. For Listing 12.05 concerning mental retardation (now referred to as "intellectual disability"),[2] he checked the box for the diagnostic definition and for

---

[2] The terminology change from "mental retardation" to "intellectual disability" became effective September 3, 2013. The change in terminology does not affect the analysis of that listing.

the severity criteria of a valid Verbal, Performance, or Full Scale IQ of 60 through 70, but he did not check a box indicating she met or equaled a listing. Instead, Dr. Kriauciunas checked the box for "RFC Assessment Necessary[.]" Dr. Kriauciunas further noted moderate limitations in maintaining social functioning and concentration, persistence, and pace, but he found no episodes of decompensation. He concluded that Smith-Johnson was able to perform unskilled work and simple tasks on a sustained basis. He also indicated that Smith-Johnson was moderately limited in her ability to understand, remember, and carry out detailed instructions, to maintain attention and concentration for extended periods, to interact with the general public, and to respond to changes at work.

In May 2009, Nikhil Vora, M.D. noted in a psychiatric evaluation that Smith-Johnson exhibited signs of a mood disorder, an anxiety disorder, and major depression. Although he found her emotional reaction was flat, he indicated that she displayed fair insight, judgment, and memory. He also noted that Smith-Johnson previously had responded well to medications, and he put her on a treatment plan. In June 2009 and September 2009, medication reviews indicated that Smith-Johnson responded favorably to medications. In December 2009, Smith-Johnson submitted to a psychosocial assessment by a non-physician, who noted that Smith-Johnson's judgment and insight were fair, but that her cognitive functioning, finances, physical health, social skills, and impulse control were a concern. In or around March 2010, psychiatrist David Villa performed a psychological intake evaluation in which he noted that Smith-Johnson appeared depressed and agitated, exhibited "average" intelligence with fluctuating memory and concentration, and exhibited poor insight and judgment.

## B. Administrative Review

Smith-Johnson filed an application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") on December 5, 2008, alleging she became disabled on January 1, 2008.[3] After initial administrative denials of her application, Smith-Johnson was given a hearing before the Administrative Law Judge ("ALJ") that was held on July 28, 2010. At the hearing, Vocational Expert ("VE") Michele Robb testified. The ALJ posed the following hypothetical to the VE:

> [A]ssume a person of the claimant's age, education, and past work, who's able to perform light work as defined by the regulations, except that she is limited to occasional foot control operation with her left lower extremity. She can only occasionally climb, crouch, kneel, or crawl. And she can frequently balance or stoop. She is limited to occasional overhead reaching with her right upper extremity. She has non-exertional limitations in that she is limited to simple, routine, and repetitive tasks and must avoid contact with the general public. Could such a person perform any of the claimant's past work?

R. 9-2, at 71. In response, the VE testified that the hypothetical individual would not be able to perform Smith-Johnson's past work, but would be able to perform other jobs in the national or regional economy, including jobs as a general office clerk, machine operator, or inspector.

In a decision dated November 29, 2010, the ALJ denied benefits. The ALJ determined that Smith-Johnson had the severe impairments of major depression, degenerative joint disease of the right shoulder, and arthritis of the left knee, but that none of the severe impairments met or equaled one of the listings for an automatic finding of disability. He did not expressly evaluate her intellectual abilities under Listing 12.05(C).

---

[3] Her application indicates that she was not disabled prior to age 22.

In his Residual Functional Capacity ("RFC") assessment, the ALJ considered, among other things, the psychological evaluation of Koopman, noting that "due to the large discrepancies in her scores, [Smith-Johnson] was not diagnosed with borderline intellectual functioning[.]" R. 9-2, at 44. He also recognized Koopman's diagnosis of a reading disorder. In terms of specific jobs Smith-Johnson could perform, the ALJ placed "great weight" on Dr. Kriauciunas's assessment that Smith-Johnson could perform unskilled work and simple tasks on a sustained basis and on Dr. Kriauciunas's opinion that Smith-Johnson had mild restrictions of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation. The ALJ also placed "substantial weight" on Koopman's assessment that Smith-Johnson could perform various jobs that did not involve direct contact with children, the elderly, or those who are ill. Based on his analysis of those limitations and her other physical and mental limitations, the ALJ determined that Smith-Johnson could not perform past relevant work but could perform light unskilled work, including work as a general office clerk, machine operator, or inspector. Therefore, he concluded that Smith-Johnson was not disabled.

That decision became the Commissioner's final decision on September 28, 2011 when the Appeals Council denied review.

## C. District Court Proceedings

Smith-Johnson filed a complaint in the Eastern District of Michigan, seeking review of the Commissioner's denial of her benefits. After the administrative record was filed, Smith-Johnson filed a motion for summary judgment, arguing that the ALJ erred 1) by failing to evaluate whether Smith-Johnson's conditions satisfied Listing 12.05(C) because there was

evidence that she could satisfy the severity criteria and 2) by failing to include all of her emotional and cognitive limitations in the RFC assessment and the hypothetical presented to the VE. Instead of directly opposing that motion, the Commissioner filed a cross-motion for summary judgment on the grounds that Smith-Johnson cannot show error by the ALJ because she plainly does not meet the diagnostic description of Listing 12.05(C) and the RFC assessment and the hypothetical adequately accounted for her limitations. Smith-Johnson opposed the Commissioner's motion, but the Commissioner did not file a reply.

### 1. Report and Recommendation

After the briefing period expired, the Magistrate Judge issued a Report and Recommendation in which he recommended affirming the Commissioner's final decision and granting summary judgment to the Commissioner. As to Listing 12.05(C), the Magistrate Judge concluded that neither Koopman's report nor Dr. Kriauciunas's evaluation supported a finding of intellectual disability. With respect to the hypothetical, the Magistrate Judge reasoned that the terms "simple, routine, unskilled work" are not always insufficient to describe moderate limitations in concentration, persistence, or pace, and it was not necessary for the ALJ to include all of the discrete findings of Dr. Kriauciunas in the RFC assessment or in the hypothetical to the VE.

### 2. District Court Opinion

After addressing Smith-Johnson's objections, the district court adopted the Magistrate Judge's Report and Recommendation granting summary judgment to the Commissioner. With respect to Listing 12.05(C), the district court held that: 1) Dr. Kriauciunas's evaluation did not support a finding of disability because he "found Smith-Johnson met the introductory diagnostic

7

description, but not any of the four criteria to satisfy Listing 12.05"; 2) it was reasonable for the ALJ to conclude that the discrepancy between the WAIS-III scores was partially explained by a reading disorder; 3) although Smith-Johnson demonstrated signs of the requirements for Listing 12.05, there "was no evidence that the degree of limitation rose to the sufficient level of severity to impos[e] an additional and significant work-related limitation of function"; 4) Koopman opined as to work Smith-Johnson actually could perform, rather than only to work that was of interest to Smith-Johnson; and 5) the ALJ need not perform a Step Three analysis for every finding in the transcript where the evidence did not show that she met or equaled a listing. R. 26, at 566-69. As to the hypothetical, the district court determined that the ALJ adequately conveyed Smith-Johnson's limitations in the RFC and hypothetical to the VE.

The instant appeal followed.

## II. JURISDICTION

The district court had federal question jurisdiction over the case pursuant to 28 U.S.C. § 1331 because the case was brought under 42 U.S.C. § 405(g) of the Social Security Act, as amended. This court now has jurisdiction because Smith-Johnson has appealed from a final judgment of a federal district court that disposed of all of her claims. 42 U.S.C. § 1291.

## III. STANDARD OF REVIEW

An appellate court reviews de novo a district court's decision regarding Social Security disability benefits. *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 374 (6th Cir. 2013) (citing *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)). Its review is limited to determining whether the Commissioner's decision relied upon the correct legal standards and was supported by substantial evidence in the record. *Id.* "Substantial evidence is 'such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (internal quotation marks omitted)). "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. . . ." *McClanahan v. Comm'r of Soc. Sec.,* 474 F.3d 830, 833 (6th Cir. 2006) (internal quotation marks omitted).

## IV. ANALYSIS

Under the Social Security Act, a claimant is entitled to disability benefits if she can show her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. §§ 404.1505, 416.905. Corresponding regulations outline a five-step sequential process to determine whether an individual qualifies as disabled. *See* 20 C.F.R. §§ 404.1520, 416.920. Relevant here are Steps Three and Five. At Step Three, the ALJ considers the medical severity of the impairment. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If the impairment meets or equals one of the Social Security Listings and meets the durational requirement, then the ALJ will find the claimant disabled. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). Otherwise, the ALJ will assess the claimant's residual functional capacity. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). At Step Five, the ALJ considers the assessment of the residual functional capacity, along with the claimant's age, education and work experience, to determine if she can make adjustments to other work. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If she can make adjustments to other work, then the claimant will not be found disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

### A. Listing 12.05(C)

Smith-Johnson contends that the ALJ's failure to expressly consider at Step Three whether she met Listing 12.05(C) for intellectual disability constitutes reversible error. Appellant Br., pp. 6-11.[4] For the reasons explained below, we disagree.

Listing 12.05(C) is a listing for the mental disorder of intellectual disability. *See* 20 C.F.R. Pt. 404, App. 1, §§ 12.00, 12.05(C). One prerequisite to the evaluation of disability on the basis of a mental disorder is that there must be "documentation of a medically determinable impairment." 20 C.F.R. Pt. 404, App. 1, § 12.00(A). If a medically determinable impairment is found, then it must be evaluated under the relevant listing.

Listing 12.05(C) has two parts. The first part, which is referred to as the "diagnostic definition," requires: 1) significantly sub-average general intellectual functioning; 2) deficits in adaptive functioning; and 3) onset before age twenty-two. 20 C.F.R. Pt. 404, App. 1, § 12.05; *see also Hayes v. Comm'r of Soc. Sec.*, 357 F. App'x 672, 675 (6th Cir. 2009). The second part, which is referred to as the "severity criteria" of subsection C, requires: 1) a valid verbal, performance, or full scale IQ of 60 through 70; and 2) a physical or other mental impairment imposing an additional and significant work-related limitation or function. 20 C.F.R. Pt. 404, App. 1, § 12.05(C); *Sheeks v. Comm'r of Soc. Sec.*, 544 F. App'x 639, 641 (6th Cir. 2013).

The relevant Social Security regulations require the ALJ to find a claimant disabled if he meets a listing. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Sullivan v. Zebley*, 493 U.S.

---

[4] Curiously, Smith-Johnson conceded in her pre-hearing brief at the administrative level that she did not *meet* the diagnostic definition of intellectual disability "because there is no evidence that she had significantly subaverage general intellectual functioning prior to age 22[.]" R. 9-6, at 215. Instead, she argued to the ALJ that she *equaled* Listing 12.05(C). She now has changed course, arguing to the district court and on appeal that she could *meet* Listing 12.05(C).

521, 532 (1990). Yet, neither the listings nor the Sixth Circuit require the ALJ to "address every listing" or "to discuss listings that the applicant clearly does not meet." *Sheeks*, 544 F. App'x at 641; *see also Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507-08 (6th Cir. 2006) ("While it might be ideal for an ALJ to articulate his reasons for crediting or discrediting each medical opinion, it is well settled that[] 'an ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.'") (quoting *Loral Defense Sys.—Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999)). The ALJ should discuss the relevant listing, however, where the record raises "a substantial question as to whether [the claimant] could qualify as disabled" under a listing. *Abbott v. Sullivan*, 905 F.2d 918, 925 (6th Cir. 1990); *see also Sheeks*, 544 F. App'x at 641.

A claimant must do more than point to evidence on which the ALJ could have based his finding to raise a "substantial question" as to whether he has satisfied a listing. *Sheeks*, 544 F. App'x at 641-42 (finding claimant did not raise a substantial question as to satisfying the listing for intellectual disability where the ALJ's finding of borderline intellectual functioning simply left open the question of whether he meets a listing and where claimant pointed to only a few pieces of tenuous evidence addressing the listing). Rather, the claimant must point to specific evidence that demonstrates he reasonably could meet or equal every requirement of the listing. *See Sullivan*, 493 U.S. at 530 ("For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of the criteria, no matter how severely, does not qualify."); *Foster v. Halter*, 279 F.3d 348, 354-55 (6th Cir. 2001) (claimant must satisfy the diagnostic description *and* one of the four sets of criteria); *see also Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011) (holding that it

11

was not harmless error for the ALJ to fail to analyze Step Three as to an impairment found to be severe at Step Two where the claimant put forth evidence that possibly could meet the relevant listing).[5]  Absent such evidence, the ALJ does not commit reversible error by failing to evaluate a listing at Step Three.

Here, the ALJ's decision does not discuss Listing 12.05(C).  The court therefore must determine whether the record evidence raises a substantial question as to Smith-Johnson's ability to satisfy each requirement of the listing.

Although the Commissioner contends that Smith-Johnson cannot meet the "medically determinable impairment" requirement, that legal argument is raised for the first time on appeal.  Appellee Br., pp. 18-20.  It is well-established that issues "not presented to the district court but raised for the first time on appeal are not properly before the court." *Foster v. Barilow*, 6 F.3d 405, 407 (6th Cir. 1992) (internal quotations omitted).  While this court has the discretion to consider the issue, that discretion generally is reserved for "exceptional cases or particular circumstances or when the rule would produce a plain miscarriage of justice." *Id.* (internal quotations omitted).  In this case, there is no indication that the exercise of that discretion is warranted.

The Commissioner also does not dispute that there is evidence that raises a substantial question as to whether the severity criteria under which the district court analyzed the issue can be satisfied.  The Commissioner concedes that Smith-Johnson had a Verbal IQ score of 69 and that there was no finding that the score was invalid.  Appellee Br., p. 23.  The Commissioner also

---

[5] Although the *Reynolds* decision was decided under the harmless-error standard, the holding indicates that the threshold showing of evidence supporting the listing must be made.  If a substantial question is raised, then it cannot be harmless error since the claimant could have been found disabled. *Reynolds*, 424 F. App'x at 416.

has not argued that the second requirement of the severity criteria could not possibly be satisfied. Appellant Br., p. 23.[6]

The final consideration is whether the record evidence raises a substantial question as to Smith-Johnson's ability to satisfy the diagnostic definition. The diagnostic definition is not satisfied merely because one Verbal IQ score is within the range contemplated by subsection (C) of the severity criteria. *Courter v. Comm'r of Soc. Sec.*, 479 F. App'x 713, 721 (6th Cir. 2012) (noting that an IQ score that satisfies the severity criteria alone does not require a finding of intellectual disability). Indeed, the "results of standardized intelligence tests may provide data that help verify the presence of mental retardation" but they are "only part of the overall assessment." 20 C.F.R. Pt. 404, App. 1, § 12.00(D)(6)(a); *see Daniels v. Comm'r of Soc. Sec.*, 70 F. App'x 868, 872-74 (6th Cir. 2003) (evaluating additional evidence of intellectual functioning under the diagnostic criteria).

In this case, Smith-Johnson has not pointed to any record evidence that raises a substantial question as to whether she satisfied the diagnostic definition. Of overall significance is the ALJ's recognition that no mental-health professional who evaluated Smith-Johnson determined that she had an intellectual disability or the less severe borderline intellectual functioning. *See Sheeks*, 544 F. App'x at 641-42 (even when a finding of borderline intellectual

---

[6] It is worth noting, however, that the district court correctly recognized that Dr. Kriauciunas did not find that Smith-Johnson met any of the four severity criteria of Listing 12.05. Dr. Kriauciunas checked only the box corresponding to the severity criteria in Listing 12.05(D). Although Listing 12.05(D) requires marked restrictions or repeated episodes of decompensation, he determined that she was not markedly limited in any of the relevant functional capacities and found no episodes of decompensation. 20 C.F.R. Pt. 404, App. 1, §12.05(D). Thus, he did not find that she satisfied the severity criteria of subsection (D) in their entirety. Nevertheless, her Verbal IQ score and the ALJ's finding that Smith-Johnson had severe depression and several severe physical impairments suggest that Smith-Johnson possibly could satisfy the severity criteria of subsection (C).

functioning exists, that finding alone does not raise a substantial question as to whether the claimant meets the diagnostic definition of Listing 12.05). The comments from Smith-Johnson's treating physicians that she displayed "average" intelligence further suggest she did not display signs of an intellectual disability that would meet Listing 12.05(C).

Smith-Johnson's argument that Dr. Kriauciunas opined that she met Listing 12.05(C) is based on two perfunctory check marks on the evaluation form. Although those check marks indicate that some relevant documentation may exist, they do not conclusively demonstrate that the requirements of Listing 12.05(C) are satisfied in their entirety.[7] Indeed, if Dr. Kriauciunas had determined that Smith-Johnson satisfied the requirements in their entirety, then he would have concluded that Smith-Johnson met or equaled Listing 12.05(C). He did not. Instead, he determined that an RFC assessment was necessary. His conclusion thus supports, rather than contradicts, the ALJ's decision not to evaluate Listing 12.05(C).

Further, as the ALJ explained in his RFC analysis, the findings and opinions of Koopman upon which Dr. Kriauciunas relied to support his perfunctory check mark for the diagnostic definition demonstrate an evidentiary deficiency as to the requirement of sub-average general intellectual functioning. Most importantly, Koopman did not diagnose Smith-Johnson with mental retardation or even borderline intellectual functioning, despite her low Verbal IQ score. Instead, she "Deferred" the diagnosis for AXIS II (where intellectual disability is assessed), indicating she lacked sufficient information to make a diagnosis. Her final narrative that was

---

[7] The court disagrees with the district court's statement that Dr. Kriauciunas found the diagnostic definition to be satisfied. That statement was based solely on the check mark in the box for the diagnostic definition, which provides no indication of the extent to which Dr. Kriauciunas found the diagnostic definition satisfied.

offered consistent with the regulations indicated that Smith-Johnson's Verbal IQ score underestimates her abilities, and that her Performance IQ score, which is in the low-average, rather than the sub-average, range, is the better measure of her innate abilities. *See* 20 C.F.R. Pt. 404, App. 1, § 12.00(6)(a) ("[S]ince the results of intelligence tests are only part of the overall assessment, the narrative report that accompanies the test results should comment on whether the IQ scores are considered valid and consistent with the developmental history and the degree of functional limitation."). She further identifies Smith-Johnson as having a reading disorder where reading comprehension presents a significant difficulty "relative to her overall ability."[8] Considering her findings, Koopman determined that Smith-Johnson could perform several clerical jobs. Therefore, Koopman's report, as credited by the ALJ, does not demonstrate that Smith-Johnson had the sub-average general intellectual abilities necessary to satisfy the diagnostic criteria, and it possibly indicates that Smith-Johnson's reading disorder contributed to her low Verbal IQ score. *See Daniels*, 70 F. App'x at 872-73 (finding substantial evidence supported the ALJ's finding that claimant was not mentally retarded where claimant had a performance IQ of 67 because the examining doctor found claimant to be within the borderline range of intelligence and clinically appeared "to function in the dull-normal range of intelligence").

Although Smith-Johnson takes issue with the consideration of Koopman's report because she is not an "acceptable medical source," she makes no attempt to explain why a report that is co-signed by an acceptable medical source (a licensed psychologist) cannot be considered. Even

---

[8] She noted a thirteen-point difference between Smith-Johnson's reading comprehension score of 76 and her "general cognitive ability," suggesting that the Performance IQ score of 89 represents Smith-Johnson's "general cognitive ability."

assuming, however, that the report does not come from an acceptable medical source, the regulations plainly permit consideration of that report. Specifically, the objective findings in the report are properly considered because they are relied upon by Dr. Kriauciunas, a non-examining state agency consultant whose opinion should be given weight only "insofar as [it is] supported by evidence in the case record." SSR 96-6p; *see also* 20 C.F.R. § 404.1527(c)(3)-(4). Koopman's opinions also are properly considered under the regulations that require evaluation of every medical opinion "[r]egardless of its source," and that permit "other sources" to be used to determine severity. 20 C.F.R. §§ 404.1513(d), 404.1527(c).

Moreover, contrary to Smith-Johnson's contention, the above is not an improper post-hoc rationalization of the ALJ's failure to consider Listing 12.05(C). Undoubtedly, there is a fine line between a post-hoc rationalization and a determination as to whether the record evidence raises a substantial question. Yet, it is proper for the court to evaluate whether the findings and opinions of the mental-health professional that Smith-Johnson contends supports a disability determination raises a substantial question. It also is proper to consider the ALJ's evaluation of the mental-health assessment of Koopman at other steps of his decision to determine how to credit the evidence at issue in this appeal. *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006) (finding that the ALJ appropriately considered a claimant's combined impairments at step three in part because he "described evidence pertaining to all impairments, both severe and non-severe, for five pages earlier in his opinion and made factual findings").[9] In this case, our

---

[9] *See also Snoke v. Astrue*, No. 2:10cv1178, 2012 U.S. Dist. LEXIS 21930, at *19 (S.D. Ohio Feb. 22, 2012) (report and recommendation) ("[T]he requirements for an ALJ's listing impairment are not so legalistic that the requisite explanation and support must be located entirely within the section of the ALJ's decision devoted specifically to step three[.] Rather, . . . a court must read the ALJ's step-three analysis in the context of the entire

analysis leads to a conclusion that the record evidence does not raise a substantial question as to whether she meets the sub-average general intellectual functioning requirement of Listing 12.05(C).

Even if the court were to find a substantial question as to whether Smith-Johnson had significant sub-average general intellectual abilities in or around 2008 at the age of 45, that finding does not account for the onset requirement of the diagnostic definition. Smith-Johnson points to no record evidence that her purported intellectual deficiencies manifested prior to age twenty-two. *See West v. Comm'r of Soc. Sec.*, 240 F. App'x 692, 698 (6th Cir. 2007) (considering whether claimant demonstrated onset of sub-average general intellectual functioning prior to age twenty-two); *Sheeks*, 544 F. App'x at 642 (same). The record evidence in fact shows that Smith-Johnson was not placed in special-education classes in high school and that she graduated high school despite some social difficulties.[10]

Accordingly, the ALJ did not commit reversible error in failing to assess Smith-Johnson's cognitive abilities under Step Three, and we affirm the district court's judgment, although under the diagnostic definition, rather than the severity criteria, of Listing 12.05(C).

## B. Limitations in the RFC and the VE Hypothetical

Smith-Johnson contends that the RFC assessment and the hypothetical posed to the VE did not accurately portray her cognitive and emotional limitations, and thus, the ALJ's

---

administrative decision, and may use other portions of a decision to justify the ALJ's step-three analysis.") (citing *Bledsoe*, 165 F. App'x at 411), *adopted by* 2012 U.S. Dist. LEXIS 42361 (S.D. Ohio Mar. 28, 2012); *Fischer-Ross v. Barnhart*, 431 F.3d 729, 735 (10th Cir. 2005) (holding an ALJ's findings at step four and step five precluded a claimant from qualifying for a listing under step three).

[10] She also conceded in her pre-hearing administrative brief presented to the ALJ that she did not meet that onset requirement.

conclusion as to her abilities to perform work was not supported by substantial evidence. For the reasons explained below, we disagree.

When the Commissioner seeks to rely on the testimony of the VE to show the existence of a substantial number of jobs other than past work that the claimant can perform, the testimony must have been given in response to a hypothetical question that accurately portrays the claimant's physical and mental impairments. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 513, 516 (6th Cir. 2010). An improper hypothetical cannot serve as substantial evidence. *Id.* Nevertheless, hypothetical questions must incorporate only the limitations that the ALJ has accepted as credible. *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993).

The ALJ determined that Smith-Johnson "can perform simple, routine, repetitive tasks, but must avoid contact with the general public," and he included these findings in his hypothetical question to the VE. In Smith-Johnson's view, this portion of the hypothetical omitted four restrictions identified by the mental-health professionals upon which the ALJ relied: 1) Dr. Kriauciunas's conclusion that she is moderately limited in her ability "to maintain attention and concentration for extended periods"; 2) Dr. Kriauciunas's conclusion that she is moderately limited in her ability "to respond to changes at work"; 3) Koopman's statement that Smith-Johnson has "weak" attention, concentration, and memory; and 4) Koopman's statement that Smith-Johnson needs a "very low stress environment." Appellant Br., pp. 11-14; Appellant Reply, pp. 6-8. Although the ALJ did not describe Smith-Johnson's limitations using the exact language of those professionals, substantial evidence demonstrates that the ALJ adequately portrayed her limitations in his RFC and the hypothetical question to the VE.

18

Smith-Johnson's first challenge concerns her concentration, persistence, or pace. She relies on *Ealy*, 594 F.3d 504, to support her argument that more specific limitations should have been included in the hypothetical to the VE. Yet, *Ealy* is distinguishable from this case. In *Ealy*, the claimant's doctor limited him to "simple, repetitive tasks [for] [two-hour] segments over an eight-hour day where speed was not critical." *Ealy*, 594 F.3d at 516. In that RFC assessment, however, the ALJ included only a limitation to "simple repetitive tasks and instructions in non-public work settings." *Id.* That RFC finding was included in the hypothetical to the VE. *Id.* This court held that the RFC assessment and the hypothetical did not adequately reflect the claimant's limitations because it truncated the doctor's specific restrictions. *Id.*

Here, the limitation to simple, routine, and repetitive tasks adequately conveys Smith-Johnson's moderately-limited ability "to maintain attention and concentration for extended periods." Unlike in *Ealy*, Dr. Kriauciunas did not place any concrete functional limitations on her abilities to maintain attention, concentration, or pace when performing simple, repetitive, or routine tasks. Instead, Dr. Kriauciunas plainly determined that Smith-Johnson could perform simple tasks on a "sustained basis," even considering her moderate limitations in maintaining concentration and persistence for "extended periods." In other words, the limitation to simple tasks portrays the tasks that she can perform without being affected by her moderate limitations. The ALJ thus did not fail to include a restriction on her ability to maintain concentration, persistence, or pace while performing simple tasks, and he further reduced the required attention and concentration by restricting her to routine and repetitive tasks.

Second, Dr. Kriauciunas's conclusion that Smith-Johnson is moderately limited in her ability "to respond to changes at work" is reflected by the terms "routine" and "repetitive."

19

Again, Dr. Kriauciunas did not provide any concrete limitations as to the particular type of changes with which Smith-Johnson has difficulty. A functional limitation to routine and repetitive tasks, and to limited interaction with the general public, provides structure and monotony so as to reduce work changes to which Smith-Johnson would have to respond.

Third, the ALJ's RFC assessment demonstrates that after considering the record evidence, he did not give weight to Koopman's statement that Smith-Johnson has "weak" attention, concentration, and memory, and instead, adopted the opinion of Dr. Kriauciunas that Smith-Johnson had "moderate" limitations in attention and concentration over extended periods.[11] That determination is supported by substantial evidence. In her report, Koopman does not identify "weak" memory, attention, and concentration as barriers to employment. In addition, subsequent evaluations of Smith-Johnson reflected at least "fair" or "fluctuating" memory and concentration. Yet, even if the ALJ should have adopted that finding of Koopman, he adequately accounted for it in his hypothetical. Viewed in context, Koopman associated Smith-Johnson's memory deficiencies with the processing of complex information. By implication, Smith-Johnson's memory deficiencies would be reduced by limiting her to "simple" tasks. Moreover, Koopman was aware of Smith-Johnson's deficiencies when she identified Smith-Johnson's strength as her ability to learn a new task quickly and make it automatic. A limitation to "routine and repetitive" tasks accounts for those tasks she can perform despite her purported deficiencies. *See Parks v. Soc. Sec. Admin.*, 413 F. App'x 856, 866 (6th Cir. 2011) (limitation to no "more than simple instruction" reflects doctor's determination that the

---

[11]An ALJ "can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." *Loral Defense Sys.—Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999). His factual findings as a whole must show only that he implicitly resolved the conflicts in the evidence. *Id.*

claimant's ability to understand and remember was limited because of long-term memory impairment).

Fourth, the ALJ did not expressly adopt Koopman's statement that Smith-Johnson needs a "very low stress environment[.]" Yet, when the statement is viewed in context, it is apparent that the ALJ adequately provided a functional restriction for that limitation. Koopman indicated in her report that Smith-Johnson performs well psychologically in structured situations or when interpersonal demands are low, but that Smith-Johnson has psychological difficulties when under stress. That leads to her recommendation of a low-stress environment. By limiting Smith-Johnson to "simple, routine and repetitive tasks" and avoidance of interaction with the general public, the ALJ functionally limited Smith-Johnson to work in the identifiable situations in which she performs well psychologically.

Offering further support for those conclusions is the fact that the jobs identified by the VE (general office clerk, machine operator, inspector) are similar to those identified by Koopman (clerical jobs such as receptionist, secretary, legal assistant, medical billing).[12] Although it may not always be true that a RFC or hypothetical limiting the claimant to simple, routine, repetitive tasks and avoiding contact with the general public will account for each of the above factors, the manner in which the limitations arose in the case and their substantial overlap with one another as reflected in the opinions of the professionals substantially support the ALJ's RFC and hypothetical.

---

[12] Although Koopman indicated that Smith-Johnson was not receiving treatment at the time of examination and needed such treatment prior to employment, the record evidence indicates that Smith-Johnson had been receiving such treatment in 2009 and 2010 following Koopman's report.

Accordingly, the ALJ did not commit reversible error in regard to the limitations included in his RFC or in the hypothetical question posed to the VE, and we affirm the judgment of the district court.

## V.  CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.